GEORGE C. ORCHARD, Appellant, v. GLOBE PRINTING COMPANY.

Division One, February 29, 1912.

1. **PLEADING: Cause of Action: Demurrer: Admission.** A demurrer to the petition does not concede the truth of mere illustrations, conclusions, comments or argumentative allegations made in the petition; but it does admit the truth of all facts, not absurd or impossible, well pleaded. Where the petition in a libel suit sets out a circular containing certain defamatory facts concerning plaintiff and charges they were false, a demurrer thereto admits those statements of facts were false. So also does the demurrer admit the truth of the allegations of the petition that the plaintiff had demeaned himself as an honest man and good citizen, was a person of good name and fame, and that his neighbors so esteemed him until the circular was published.

2. ————: ————: **Libel.** The petition charged that defendant had published in its newspaper a circular in which it was stated that plaintiff, with other named "self-constituted leaders"

of the Democratic party, had entered "into a contract" with "low" negroes of the town to get, or at least try to get, a pardon for a self-confessed negro thief then in the penitentiary, and in return the negroes were to give their votes and influence to the Democratic nominee for the Legislature at the approaching election; that a petition for the pardon of the thief had already been signed, and presented to the Governor, and he would act upon it immediately after the election; that when the writers "got word of this basest of criminal boodleism" they set out to ascertain the real facts of the case "and upon the closest investigation were horrified to find the facts bear out the report as to the agreement and the persons implicated in it;" and the circular denounced the affair as a "corrupt agreement," an "unlawful and *unwholly* agreement," a "corrupt alliance," and says it comes from men having "convictions of right and wrong" and is addressed to men of "the same convictions." *Held*, that the petition states a cause of action, though the main object was to defeat the Democratic nominee for the Legislature, and that nominee was not the plaintiff.

3. ————: ————: ————: **Reputation.** A man's good reputation is as much within the protection of the law as is his property; and a petition which charges the publication of a circular which contains charges of a "corrupt agreement" showing, if true, that plaintiff had been guilty of moral turpitude and of conduct forfeiting his right to a reputation as a good citizen and a good man in matters of lively concern to the public, which charges the petition alleges are false and which are, by a demurrer, admitted to be false, states a cause of action.

4. ————: ————: ————: **Pardon of Thief for Votes.** To dangle a pardon for a thief before the eyes of his low companions as an inducement for their votes at a public election, or to take part directly or indirectly in such disreputable scheme, debauches public morals, hamstrings civic virtue, and is a palpably dishonorable breach of good citizenship; and to be falsely charged with doing that, is libelous; and a petition alleging that defendant published such charges concerning plaintiffs and that they were false, calls on the publisher to either justify, palliate, mitigate or bring itself within some phase of the doctrine of privilege, or, failing to do either, to make reparation.

5. **LIBEL: Definition.** Each case of libel should stand on its own facts, since the language used is rarely the same, and libel is as difficult of definition as fraud or negligence. But the statutory definition is good enough for usual purposes. (Sec. 4818, R. S. 1909).

6. ———: ———: **Necessary Elements: Malicious Defamation,
etc.** The published writing must contain "malicious defama-
tion," that is, the injury of another's reputation by a slanderous
communication, detraction, calumny or aspersion; and the idea
of falsity must be included, for the truth is a defense, and,
besides, the idea of falsity is shadowed forth in the words
"malicious defamation;" but malice does not necessarily mean
express malice (malice personal to the individual), though ex-
press malice may be shown to enhance punitive damages, but
malice as defined in the law. And the writing must be of a
character to provoke the other to wrath, or to expose him to
public hatred, contempt or ridicule, or to deprive him of the
benefits of public confidence and social intercourse.

7. ———: ———: **Charging Crime.** There can be a libel with-
out a crime charged in the libelous writing. If the petition,
liberally construed, charges a libel in a broad sense under the
statutory definition, it states a cause of action, though it also
attempts to charge a crime.

8. ———: ———: ———: **Self-Curing: No Crime in Strict
Legal Sense.** And where the petition charges a libel in a broad
sense under the statutory definition, it cannot be held that
the published writing was self-curative and carried the antidote
along with the poison self-evidently, in that it charges no
crime in a strict legal sense. Even if it do not charge a crime
as a crime by the use of the words "boodleism" and "bribery,"
yet if its sting is not coiled up in the use of those words, but
lies in the whole article, which, if untrue, contains the ele-
ments of statutory libel, it is libelous.

9. ———: **Slander.** Libel and slander cannot be put upon the
same foot. Many things are libelous *per se* when put in
writing and published that are not slanderous *per se.*

Appeal from Butler Circuit Court.—*Hon. J. C.
Sheppard,* Judge.

REVERSED AND REMANDED.

*Reed, Yates, Mastin & Harvey* and *Orchard &
Cunningham* for appellant.

(1) It is not necessary that language should charge
a crime in order that it should be libelous. Any lan-
guage calculated to bring about the conditions de-

nounced by our statutory definition of libel is libelous *per se.* Press v. Whitely, 50 Mo. 440; Ferguson v. Publishing Co., 72 Mo. App. 465. In which latter case the succinct language of Odgers on Libel and Slander is quoted: "Every libel is actionable *per se.*" All other cases supporting this doctrine are cited in the last named case, to which we add: McGinnis v. Knapp, 109 Mo. 149; Morse v. Times Republican, 124 Ia. 708; McDonald v. Press Co., 55 Fed. 264. (2) If the language is libelous no innuendoes are necessary. Farley v. Evening Chronicle, 113 Mo. App. 216. If it appears that the article sued on is libelous within the statutory definition, then the plaintiff had a cause of action, though it fell far short of charging a criminal act, and that part of the petition which charges that the language is susceptible of such an interpretation may be wholly rejected and verdict had upon the other theory of the case. Hudson v. Garner, 22 Mo. 423; Michael v. Matheis, 77 Mo. App. 556; Callahan v. Ingram, 122 Mo. 366; Julian v. Star Co., 209 Mo. 65.

*Lon O. Hocker* and *Lew R. Thomason* for respondent.

(1) In an action for libel, the words alleged to be libelous are to be construed or interpreted in their plain and popular sense and as they are generally understood. Newell on S. & L. (2 Ed.), sec. 27, *et seq.;* Diener v. Publishing Co., 230 Mo. 627; Roberts v. Camden, 9 East R'ep. 93; Fallenstein v. Booth, 13 Mo. 306; Moore v. Bennett, 48 N. Y. 472. (2) The article complained of must be construed as a whole, since one part of the publication may explain another part, and since the intent and meaning must be gathered not alone from the words alleged to be libelous, but from the context, the maxim *noscitur a sociis* applies. Diener v. Publishing Co., 230 Mo. 625; Kilgour v. Evening Star, 96 Md. 27; McAllister v. Free Press, 76 Mich. 338; Gaither v. Advertising Co., 102 Ala. 452. (3) In order

to render words actionable on the ground that they impute criminality to the plaintiff, they must be such as charge him with an offense indictable or otherwise punishable, involving moral turpitude, or subject him to infamous punishment. Brooker v. Coffin, 5 Johns. (N. Y.) 188; Pollard v. Lyons, 91 U. S. 225; Newell on S. & L. (2 Ed.), sec. 10; Cooley on Torts (Ed. 1880), p. 195; Hollingsworth v. Shaw, 19 Oh. St. 430. (4) Although the article complained of may contain words that impute, or charge plaintiff with the commission of a crime, indictable or otherwise punishable involving moral turpitude, or subject him to infamous punishment, or may tend to provoke him to wrath, or expose him to public hatred, contempt or ridicule, or deprive him of the benefit of public confidence or social intercourse; yet if they are accompanied with other words explaining the imputed offense, showing that no crime was or is charged, and explaining the real character and meaning of the language used, so that when taken all together such language is not defamatory, thus sending the antidote along with the poison, said words are not libelous or actionable, and a person suing upon the same cannot recover. Hall v. Atkins, 59 Mo. 144; Trimble v. Foster, 87 Mo. 53; Israel v. Israel, 109 Mo. App. 376; Brown v. Myers, 40 Ohio St. 99; Hayes v. Ball, 72 N. Y. 418; Fawsett v. Clark, 48 Md. 494; Line v. Spies, 139 Mich. 484. (5) The article complained of does not charge plaintiff with any violation of Sec. 6038, R. S. 1909. State ex rel. v. Bland, 144 Mo. 534. (6) The office or purpose of the innuendo in an action for libel is simply to apply the words, it cannot be substituted for an averment. It is not the statement of a fact, but is an inference, being merely explanatory in its functions; the explanation given must be a legitimate deduction from the facts stated, and not a forced, unreasonable construction, enlarging the meaning of the language to which it refers. Christal v. Craig, 80 Mo.

373; Diener v. Publishing Co., 230 Mo. 613; Boyce
v. Aubuchon, 34 Mo App. 315; Howell v. Crawford,
107 Mo. 595; Bundy v. Hart, 46 Mo. 464; Cook v. Pub-
lishing Co., —— Mo. ——.    (7) The sufficiency of
the pleadings are to be determined by the court,
and a demurrer lies to a petition sounding in tort for
libel as in any other case.   Diener v. Publishing Co.,
230 Mo. 620; Heller v. Publishing Co., 153 Mo. 205; Uk-
man v. Daily Record, 189 Mo. 378.   (8) The petition
nowhere charges by innuendo or otherwise that the
article complained of is libelous because the publica-
tion of the same is calculated to provoke the plaintiff
to wrath, and for that reason the petition cannot be
defended against the demurrer for the reason that it
is now claimed in appellant's brief that it was calcu-
lated to provoke him to wrath.   An article may be li-
belous if a reasonable construction of it can be said
to provoke the person of whom it is published to wrath.
But a publication may so provoke one person and not
another, and unless it would so provoke the plaintiff,
and is so alleged, the article cannot be said to be libel-
ous, as to him, for simply that reason.

LAMM, J.—Libel in the Butler Circuit Court.
Suit brought November 3, 1906.  Plaintiff was cast on
demurrer to his petition in 1908.  The alleged libel lies
in a circular, an appeal to their fellow Democrats of
Butler county by Henry and John Lacks, published by
defendant November 8, 1904, and which publication,
prefixed by certain head-notes and explanation, was
followed by a reference to political conditions in that
county—the whole, as set forth in the petition, read-
ing:

## CHARGE DEAL TO GET BLACK VOTE

### SAM PHILLIPS ACCUSED.

**H. and J. Lacks of Poplar Bluff Appeal to Democrats to Withdraw Support.**

Special Dispatch to The Globe-Democrat.

Poplar Bluff, Mo., November 7.

A serious split in the Democratic ranks in Butler county occurred yesterday when the following circular was brought out, signed by Henry and John Lacks, two prominent Democrats with a large following, who are opposing Sam Phillips, the Democratic nominee for Representative from this district.

"Dear Friend:  Knowing that you are and always have been a Democrat, with the convictions of right and wrong, and also knowing that you have known us as men of the same convictions, we address you as our personal friend as holding these same views, and also as a straight-forward [sic] Democrat.  Our campaign this year has been fought in our State against boodle and boodleism, and we know that you want our county politics fought out on the same line.  Now what we want to say to you is this:

"We want you to know that Ed. L. Abington, chairman of the Democratic county committee, and Geo. C. Orchard and others of the same class have gone into a contract, as admitted by them with the knowledge and consent and approval of Sam Phillips, Democratic candidate for Representative, with the lower element of the negroes of Popular Bluff, agreeing with the negroes that they (Abington, Orchard, Stanley, Phillips), will petition the Governor to pardon out of the penitentiary a negro convict who has, before two courts, pleaded that he was guilty of grand larceny, and who is now serving a term for that crime.  The promise was made by Orchard, Abington, Phillips and company to the negroes that Sam Phillips should, in return for this good work, get the negroes' influence and votes in this election.  We got word of this basest of criminal boodleism and set out to find the real facts in the case, and upon the closest investigation we were horrified to find that the facts bear out the report as to the agreement and the persons implicated in it.  We learned that the petition for the pardon had already been gotten up and signed and handed to the Governor, when he was here about a week or more ago, and that the Governor now has the petition, and that he would act upon it immediately after the election.  When the leaders in this disreputable combine found that we had learned of their

unlawful and unwholly [sic] agreement they sent word to Henry Lacks by Bert Stanley, saying that Orchard had done all this, and that he did it to get the Republican (black, we suppose) votes. We know that Orchard was implicated already, but we want you to know that there are others implicated as well as Orchard. When we learned of this corrupt agreement we endeavored to see Sam Phillips and ascertain his connection therewith. He was then out of town, but on returning in the evening and being told of the disclosure in a bunch of this combine, with some other good men, brazenly admitted that while he was not sure that he had signed the petition, he would do so if necessary, and that he would do all in his power to get the negro pardoned. We have these facts from several reliable sources, and know them to be true. The brother of the negro himself said he had such a promise.

"We sent a message to Prosecuting Attorney Price Stone of Jefferson City asking him to call on the Governor and telephone the names on the petition. This he could not do as he said the petition had not been filed and that the Governor had the same with him in St. Louis, so that we cannot advertise the petition at this time. Now we want to say to you as our friend and what we say is friendship for you as well, and as Democrats that we hope you will not tolerate and submit to this sort of boodleism in Butler county. This negro was a self-admitted criminal, and under the corrupt agreement made by the self-constituted leaders is being sent back to Butler county to prey on the law-abiding public in exchange for a few negro votes for Sam Phillips. Is this Democratic? We say, No. We say it is boodleism and nothing but boodleism. We want to say that we know of no other Democratic candidate that is implicated in this corrupt agreement. We believe there is no other. We are Democrats and are for all other Democratic nominees; but we cannot support Mr. Phillips on account of his part in this corrupt alliance with the low class of the negroes, and we ask you as our friend and as the friend to pure government and honest politics, and as a true and tried Democrat, that you do all you can as Democrat in the face of the facts to keep our party clear of corrupt officials.

"Yours very truly,

"(Signed)            "HENRY LACKS,

"JOHN LACKS."

This city is wrought up to fever heat and the outlook at the present time is for a decisive victory for the entire Republican ticket.

The substantive averments of the petition are that defendant publishes a paper called the St. Louis Globe-Democrat, of large circulation in Butler and surround-

ing counties, and in the State of Missouri, where plain-
tiff is well known, and throughout the United States;
that plaintiff had always demeaned himself as an hon-
est and faithful citizen of the State and of Butler
county, and was reputed and esteemed among his
neighbors and acquaintances a person of good name,
fame and credit—further (quoting):

"And plaintiff alleges that defendant well know-
ing such fact and intending wickedly and maliciously
to injure plaintiff in his good name, fame and credit,
and to bring him into public hatred, scorn, ridicule,
contempt, infamy and disgrace, and to deprive him
of the benefits of public confidence, and to cause it to
be believed by his neghbors and among good and
worthy citizens of the State of Missouri, that plaintiff
had been guilty of corrupt, dishonest and dishonora-
ble and criminal conduct in and about the soliciting,
procuring and obtaining votes for and upon behalf
of one Sam Phillips, who was the regularly and law-
fully nominated candidate for the office of Represen-
tative in the Lower House of the General Assembly
of the State of Missouri, to be voted for as such at a
regular and legal State and county election to be held
in the county of Butler and State of Missouri on the
8th day of November, 1904, and in order to cause it
to be believed by said hereinbefore mentioned persons
that the plaintiff had been guilty of criminal conduct
and practices, and of boodleism and bribery in order
to induce qualified voters at such election to vote for
said Sam Phillips as and for said office, and in order
to cause it to be believed by said persons hereinbefore
mentioned and the public generally that the plaintiff
had been guilty of a violation of the criminal practice
act and laws of the State of Missouri then in force
pertaining to elections, and had been guilty of the
crime of bribery by directly or indirectly giving,
offering, promising to procure or endeavoring to pro-

cure a valuable consideration (*and an award*) [sic]
to or for legally qualified voters at said election so
to be held as aforesaid, in order to induce said voters
to vote for the said Sam Phillips for said office of
Representative or member of the General Assembly
of the State of Missouri, and intending to vex, op-
press, impoverish and wholly ruin the plaintiff, did,
on the 8th day of November, 1904, in the newspaper
known as St. Louis Globe-Democrat, publish of and
concerning the plaintiff a certain false, wicked, mali-
cious, defamatory and libelous article, which said ar-
ticle was thereafter by the defendant wickedly pub-
lished and circulated, to-wit: to the number of more
than one hundred thousand copies throughout the
county of Butler in said State and throughout the en-
tire State of Missouri, and throughout the United
States generally as follows, to-wit:'' (Here follows
the publication hereinbefore set forth).

The further allegations are that the statements
made in the circular were well known by defendant to
be absolutely false and untrue; that they were pub-
lished with the malicious and express purpose of de-
faming and injuring plaintiff; that the Globe-Demo-
crat is generally considered of great influence and
power and is reasonably worth more than $1,000,000;
and that by reason of the premises plaintiff has been
brought into public hatred, scorn, ridicule, contempt,
infamy and disgrace, has been deprived of public con-
fidence, has suffered humiliation, pain and anguish of
mind, and in his reputation—wherefore he has been
damaged in the sum of $100,000 actual and $100,000
punitive damages.

(*Nota bene*: The words "*and an award*," appear-
ing in parenthesis, whatever they may mean, were in-
serted by leave of court by way of amendment, after
demurrer filed.)

Eliminating expansive and argumentative matter
from the demurrer, its gist is a general challenge to

the petition for that it does not state facts sufficient·
to constitute a cause of action.

As said, the court sustained it, and plaintiff, re-
fusing to plead over, stood on his petition, suffered
judgment and comes up by appeal. .

We are of opinion the demurrer was badly ruled.
It is a trite doctrine that a demurrer concedes the truth
of all facts, not absurd or impossible, well pleaded.
It does not concede the truth of mere illustrations,
conclusions, comments or argumentative allegations
made by the pleader.

We must assume then, on demurrer, that the facts
stated in Lacks' circular relating to Orchard are false,
for plaintiff makes that averment in his petition. What
are those facts as given tang and flavor by the descrip-
tive epithets used by the writers of the circular?
Briefly that Orchard with other named "self-consti-
tuted leaders" of the Democratic party, went "into a
contract" with "low" negroes of Poplar Bluff to get,
or at least try to get, by way of petition, a pardon for
a self-confessed negro thief then in the penitentiary.
In return for that "good work" the agreement ran
that said negroes were to vote and give their influ-
ence to the Democratic nominee for the Legislature
at the election shortly approaching. The circular, in
effect, goes on to charge that such contract was en-
tered into with and "promise" made to the negroes,
and that a petition for a pardon had actually
been signed and sent to the Governor. In other words,
the agreement had been performed on the part of Or-
chard' et al., whereby the thing had reached a stage
where there was nothing left but for the Governor to
act upon the petition which he would do after the elec-
tion, and for the negroes to perform on their part. The
circular says the agreement was made with the ap-
proval of the Democratic candidate for the Legisla-
ture, who, when charged with consenting thereto, had
admitted in a "bunch of the combine" that he would

do all in his power to get the negro pardoned. It is instructive to further notice the language used, to-wit, the circular denounced the affair "as the basest of criminal boodleism," a "corrupt ageement," an "unlawful and *unwholly* agreement," a "corrupt alliance." In short it is, of set purpose, censorious of Orchard in a high degree. Witness, its denunciatory language. For example: The circular comes from men who describe themselves as having "convictions of right and wrong" and is addressed to men of "the same convictions." That is, ostensibly, it is written by good citizens to good citizens against bad citizens. It says the campaign of 1904 in Missouri is against "boodle and boodleism," that the "closest investigation" "horrified" the writers because the facts ascertained thereby show the agreement was made. The words, "basest," "criminal," "disreputable," "combine," "implicated," "corrupt," "brazenly," "unlawful," "unwholly" (meaning, doubtless, unholy) and others filling an exclusively denunciatory and censorious office are freely used. The scope and purpose of the agreement is designated as being that the negro convict is to be "sent back to Butler county to prey on the law-abiding public in exchange for a few negro votes for" the Democratic candidate for the Legislature.

It will be observed that Orchard was not a candidate for any office in the gift of the people, and that the main object of the circular was to defeat Mr. Phillips at the polls. Orchard cannot take advantage of the libel, if any, on Phillips. [Diener v. Chronicle Pub. Co., 230 Mo. l. c. 625 *et seq.*] He can only complain of a libel on himself. But a blow may be so aimed at one man as to intentionally hit another. One may kill two birds with one stone in libel and the circular shows that is what was likely to happen in this case. The question, then, whether the blow was wrongfully aimed is up to be reckoned with.

The petition alleges that Orchard had demeaned himself as an honest man and good citizen, was a person of good name and fame and that his neighbors so esteemed him until that circular came out. On demurrer these allegations are taken as true.

A man's good reputation is within the protection of the law. It would be a sad commentary on the law if it did not sedulously protect a citizen's right to a good reputation from wrongful attacks precisely as it sedulously protects his other property rights from like attacks. His life, his limb, his real estate and moveables, are in the keeping of the same laws that shield his reputation. Now, a dispassionate and intelligent reading of the circular, as reprinted by defendant, tells the story, among others, that its writers wanted the world to know that Orchard had been guilty of moral turpitude, of conduct forfeiting his right to a reputation as a good citizen and good man in matters of lively concern to the public. If he did in fact, or substantially or through others, what the circular says he did then every word of condemnation was well bestowed, all the licks of the Lacks were well laid on, and they and defendant did excellent and prime public service in publishing the facts and comments to the world in connection with the election to be held that day. All of which is saying no more than if the *facts* stated by the circular are true, then the *comment* was timely, however sharp. But if Orchard is falsely accused, what then? His petition says the circular was false. That means he took no part in the negro dicker and made no such promise. That is the view, as said, we are to take on demurrer to his petition, and, in that view of it, was the circular not well calculated to wrongfully take from him his good fame and reputation?

To dangle a pardon for a thief before the eyes of the low companions and friends of the thief as an inducement for their votes at a public election, as one would hold out an ear of corn to an ox or ass to halter

him, or to take part directly or indirectly in such disreputable scheme debauches public morals, hamstrings civic virtue and militates against the best interests of society. It is a palpably dishonorable breach of good citizenship. To be falsely charged with doing that is libelous and calls on defendant to either justify, palliate, mitigate, or bring itself within some phase of the doctrine of privilege, or, failing, make just reparation.

There are many technicalities and niceties in the law of libel and slander involving the offices of inducements, innuendoes, colloquiums and nice shading in the definition of terms. The subject-matter is tender, society is not organized on an ideal basis, men are not perfect and the law doing the best it can seeks practical and attainable results, keeping in mind not only the rights of the individual man but the good of society at large. He would be a bold judge who would say that some of the learning is not incomprehensible or that there is not much discord in the cases. It seems settled that each case should stand on its own facts, since the language used is rarely the same. Such is the rule in the kindred matter of interpreting wills.

Libel is as difficult of definition as fraud or negligence. There are many pointed ones in the books, but all of them are necessarily couched in general language. In Missouri the lawmaker has given us one, good enough for our purpose, viz.:

"A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, or any malicious defamation made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends." [R. S. 1909, sec. 4818.]

Any published writing that fills the bill of that

statutory definition is a libel in Missouri.  There must be "malicious defamation," that is, the injury of another's reputation by a slanderous communication, detraction, calumny, aspersion.  [Web. tit., "defamation;" Diener v. Star-Chronicle Pub. Co., 232 Mo. l. c. 433.]  In the present state of our law in this jurisdiction the idea of falsity must be included; for the truth is always a defense.  Indeed the idea of falsity is shadowed forth in the statutory phrase, "malicious defamation."  Malice is an ingredient under the definition, but that does not necessarily mean express malice—malice personal to the individual injured.  It means malice as defined by the law, though express malice may be shown to enhance punitive damages and reap smart money.  So the writing must be of a character to provoke him to wrath, or to expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse.

It is aptly charged in the petition that the alleged libelous article is one of that character.  We think on its face it meets that statutory definition on demurrer; for, if false, does it not plainly indulge in aspersion, calumny, defamation?  Are its arrows, on that theory, not winged and tipped with biting epithets and is its studied terminology not that of denunciation and detraction?  Among good people, keenly alert to a clean election of good officials and a decent and manly performance of the most solemn duties of good citizenship in casting their ballots for the general weal, the natural and certain tendency of a false circular like that in hand is alleged to be, would be to expose Orchard to public hatred, contempt and ridicule, or to deprive him of the benefits of public confidence and social intercourse, for moral turpitude is brought home to him by the charges.  Even in politics to do evil that supposed good may come of it; and the end justifies the means, are not acceptable precepts among right thinking people.

It is argued on behalf of respondent that the petition charges the commission of a *crime,* and that such construction cannot fairly be put upon the words of the circular, therefore the demurrer was well ruled.  If there could be no libel without a crime charged in the libelous writing, it would be well worth while to look into that question closely.  But such is not the law of libel. Or if the petition counted only, as some petitions have done, on the theory a criminal charge is made in the writing, then it would be well worth while to critically analyze the petition to see whether it charged a crime in fact; for in that view of it the pleader would be held to his preclusive allegation, and if the allegations by way of innuendo were strained construction put upon the language of the writing a demurrer would lie to the petition, precisely as a demurrer would lie to the evidence if no case was made on behalf of plaintiff. But in this case the petition, as heretofore pointed out, does not alone attempt to charge a crime.   Liberally construed it also charges a libel in a broad sense under the statutory definition we have been discussing.

The law is that defamatory words published of one, if false, are actionable—keeping steadily in mind the definitions of "libel" and "defamation" heretofore given.   [McGinnis v. Knapp & Co., 109 Mo. 131; Farley v. Publishing Co., 113 Mo. App. 216; Julian v. Star, 209 Mo. l. c. 89 *et seq.*]   Wherefore we have no call at this time to pass on the question whether the circular also charges a crime under the Corrupt Practice acts relating to elections; for the demurrer, as we have shown, does not break on that question as decisive; and it will be time enough to pass on it when the case, if ever, reaches an appellate court on the evidence and instructions and such question be well lodged in the case for decision.

It is also argued for respondent that on the very face of the circular the thing cured itself, that the antidote went with the poison, if any—that is that self-

evidently there could be, under the wording of the circular, no "boodle" or "boodleism" as those slang words are defined by those harmless drudges that busy themselves (see Johnson's dictionary, tit. "Lexicographer") in tracing the originals and detailing the signification of words, yclept lexicographers (Web., tit. "Boodle;" Boehmer v. Free Press Co., 94 Mich. 7), and no "bribery" in a strict legal sense; therefore there was no crime charged and no libel—this under a line of cases of which Hall v. Adkins, 59 Mo. 144, is a specimen.

We pause to remark, by way or moralizing, that the antidote (or other palliative) theory must be well looked to when called into use; for, if I wrongfully wound a man it stands me smartly in hand to see to it that I put oil, not salt and pepper, in the wound. [Morse v. Printing Co., 124 Ia. 1. c. 717.]

But this view of the matter is but a phase of the proposition just discussed and ruled against respondent. We hold that the entire libelous sting in the circular does not lurk coiled up in the words "boodle," "boodleism" and "bribery," that is, in the charge of a commission of a crime, qua crime, but lies as well in the whole article, which, if untrue, covers the statutory elements constituting a libel as hereinbefore determined. And the pleading with the innuendoes seems broad enough to take in that view of it. [See authorities cited by appellant.]

Respondent's learned attorneys cite us to many cases relating to slander which they contend sustain their position. [Pollard v. Lyon, 91 U. S. 225, a leading case and others from our own court on the same line.] But they inadvertently fall, we think, into the error of putting libel on the same foot with slander. The learning on the matter teaches us that many things are libelous *per se,* when put in writing and published that are not slanderous *per se,* or at all, when spoken by word of mouth. The kernel of the matter in these

subtle distinctions lies in the axiom: The spoken word flies; the written letter remains. (*Vox emissa volat; litera scripta manet.*) [Odgers on Libel (4 Eng. Ed.), 2, *et seq.*; Ukman v. Daily Record Co., 189 Mo. l. c. 391, and cases cited.]

The suit was belated, yet it comes within the limitation period by five days, and the damages asked, $200,000, are so inflamed as to be *impossible.* Such prayer is but the child's cry for the moon. It cannot be said, however, that there is no fad or fashion in these latter days in that direction in libel suits. But none of these matters are before us on demurrer.

The judgment is reversed and the cause remanded with the option to defendant to further plead. All concur, *Woodson, J.,* in result.