M. & M. SECURITIES COMPANY, RESPONDENT, v. GENERAL MOTORS ACCEPTANCE CORPORATION, A CORPORATION, APPELLANT.—79 S. W. (2d) 521.

St. Louis Court of Appeals. Opinion filed March 5, 1935.

*Clarence F. Wescoat* for appellant.

*Stern & Burnett* for respondent.

HOSTETTER, P. J.—This is an action in trover instituted on September 17, 1930, in the circuit court of the city of St. Louis, to recover damages for the alleged conversion of three automobiles, all of the 1929 model. The petition is in three counts. The date of the alleged conversion is the same in each of the three counts, to-wit: November 23, 1929. The first count relates to a Pontiac, four-door sedan, serial No. 557087, motor No. 633901; the second count relates to an Oakland Brougham, serial No. 268377, motor No. 285471; and the third count relates to a Pontiac four-door sedan, serial No. 563204, motor No. 640865.

Defendant in its amended answer states that it acquired title to the three cars in controversy from the Oakland Motor Car Company, manufacturer, by bills of sale; the bill of sale relating to the car described in the first count being dated August 5, 1929, the one relating to the car described in the second count being dated July 30, 1929, and the one relating to the car described in the third count being dated August 14, 1929; that it had not sold, assigned or conveyed, nor authorized any person, firm or corporation to sell, assign or convey its title to or any interest in said three automobiles to any person,

firm or corporation whatsoever, and averred that it (defendant) by its conduct was not precluded from denying the authority of any person, firm or corporation to sell, convey or assign the title to or any interest in said automobiles. Further answering the defendant challenged the validity of the three conditional sales agreements under which it averred that plaintiff claimed some title to the cars, charging that they were, in effect, mere chattel mortgages not acknowledged or recorded as required by the statutes of the State of Illinois, setting them out and designating them as Smith-Hurd Illinois Annotated Statutes, chapter 95; and further averred the existence at all times therein mentioned in the State of Illinois of statutes collectively known as the Uniform Sales Act, found in Smith-Hurd Illinois Annotated Statutes, chapter 121½, and quoting therefrom sections 20 and 23, reading as follows:

"Where there is a contract to sell specific goods or where goods are subsequently appropriated to the contract, the seller may, by the terms of the contract or appropriation, reserve the right of possession or property in the goods until certain conditions have been fulfilled. The right of possession or property may be thus reserved notwithstanding the delivery of the goods to the buyer . . .

"Subject to the provisions of this act, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell."

Defendant further answering averred that said last mentioned statutes of Illinois, and the decisions of the appellate and Supreme Courts of Illinois construing them,· are controlling in the determination of the validity of the three conditional sales agreements under which plaintiff claims title as they were all executed in the State of Illinois covering property located within that State.

Plaintiff in its reply to the amended answer denied defendant's averment therein that it (defendant) was not precluded from denying the authority of any person, firm or corporation to sell, convey or assign the title to or any interest in said automobiles.

Further replying plaintiff admitted the statutes in relation to chattel mortgages to exist and be effective in the State of Illinois as claimed in said amended answer, and further admitted that it claimed ownership in the three automobiles by virtue of three conditional sales agreements executed in Alton, Ill., on October 8, 1929, August 28, 1929, and August 21, 1929, by Larsh-Brokaw Motor Co., a corporation, of Alton, Ill., and the purchasers of the three automobiles mentioned, and denied that said conditional sales agreements were in effect chattel mortgages and denied that it had any knowledge or

notice that said three conditional sales agreements were anything other than what they purported to be, and averred that all the right, title and interest of the Larsh-Brokaw Motor Co., in said three conditional sales agreements were purchased by plaintiff for value from the said Larsh-Brokaw Motor Company in connection with the sale and transfer by said Motor Company of the negotiable promissory notes executed by the purchasers of said automobiles for the payment of balances due on said automobiles as described in said conditional sales agreements, and that said notes and said conditional sales agreements were sold, transferred and delivered by said Larsh-Brokaw Motor Company to plaintiff before the maturity of said notes, and that plaintiff acquired said papers and all of said rights without notice of any infirmity therein, and by reason thereof, plaintiff became the owner of said three automobiles and that they were at the time of their conversion by the defendant the property of the plaintiff.

Plaintiff further replying admitted that there was, in effect in Illinois, the Uniform Sales Act, a portion of which was quoted in defendant's answer and alleged that by virtue of said statutes there was a valid retention of the title to said three automobiles in the Larsh-Brokaw Motor Company, by the execution of the conditional sales agreements, which title passed by assignment from said Motor Company to the plaintiff as theretofore mentioned and that the validity of the retention of said title, even against subsequent purchasers or encumbrancers, had been adjudicated by the Supreme Court of the State of Illinois in Sherer-Gillett Company v. Long, 149 N. E. 225.

Further replying the plaintiff averred that defendant is a finance corporation organized by the General Motors Corporation for the facilitation of the sale and distribution of automobiles manufactured by it; that the Larsh-Brokaw Motor Company, at and prior to the transactions therein involved, had been designated by said General Motors Corporation as its regular distributor and retail dealer for the Pontiac and Oakland automobiles manufactured by it; that in the regular course of dealings said Pontiac and Oakland automobiles would be shipped and delivered to the said Larsh-Brokaw Motor Company by the General Motors Corporation with the knowledge and consent of defendant for the purpose of resale; that there was some arrangement between said General Motors Corporation and defendant and the Larsh-Brokaw Motor Company, the exact nature of which was unknown to the plaintiff, whereby some secret lien upon automobiles thus delivered to the Larsh-Brokaw Motor Company was attempted to be reserved for the benefit of said defendant and said General Motors Corporation, and that said last two named corporations at all times knew that in the regular course of dealing the said Larsh-Brokaw Motor Company would sell and dispose of said automobiles at retail from its floors and would at all times act in the premises as if it were

the absolute owner of said automobiles and would execute bills of sale and conditional sales agreements on said automobiles and that said defendant, and said General Motors Corporation, expressly and impliedly consented to such course of dealings, and, at all the times mentioned, knowingly permitted the Larsh-Brokaw Motor Company to hold itself out as the absolute owner of all the automobiles in its possession; that if there was any agreement between defendant and the Larsh-Brokaw Motor Company wherein the rights of the latter were attempted to be restricted with respect to the sale of said automobiles that such agreement was a mere matter of form and sham and was observed only by its constant breach, and that defendant at no time prior to the transactions involved in this case questioned the right of the said Larsh-Brokaw Motor Company to pass title to said automobiles either by absolute transfer or by conditional sales agreements and looked only to the Larsh-Brokaw Motor Company for the payment of proceeds derived from such sales for the satisfaction of any secret lien or interest the said defendant had in said automobiles; that it was well known to the defendant that in the regular course of its business the Larsh-Brokaw Motor Company would sell said Pontiac and Oakland automobiles by conditional sales agreements wherein title would be retained by Larsh-Brokaw Motor Company for payment of balances due on purchase price from the buyer to the said Larsh-Brokaw Motor Company; that it was well known to the defendant that said Larsh-Brokaw Motor Company would then sell or discount all of its right, title or interest as conditional vendor in said conditional sales agreements and that defendant would expressly and impliedly authorize the said practices and in the regular course of dealing would receive from said Larsh-Brokaw Motor Company the proceeds derived by it from the sale or discount of said conditional sales agreements for the satisfaction of the secret rights and interest of the defendant in said automobiles; that by reason of all of these matters the defendant is estopped from claiming that the said Larsh-Brokaw Motor Company did not have authority to execute said conditional sales agreements and to transfer its title retained in said Pontiac and Oakland automobiles and was estopped at the time of the conversion of said automobiles as mentioned in the petition.

For further reply plaintiff averred that any right, title or interest of the defendant in the Pontiac and Oakland cars mentioned in the petition arose by virtue of a secret trust in the nature of a mortgage or trust deed which were void by reason of the provisions of the statutes of the State of Illinois above mentioned (Smith-Hurd Ill. Ann. Stat., chap. 95), because possession of said automobiles was given to the Larsh-Brokaw Motor Company and the instruments accompanying said secret lien or mortgage were not acknowledge and recorded as required by the provisions of said Illinois statutes and

that said secret lien or mortgage had been adjudicated invalid as against third persons by the Supreme Court of the State of Illinois in various cases therein cited.

Further replying plaintiff averred that defendant is not entitled to claim anything under the provisions of said Illinois statutes inasmuch as it is not a third person within the meaning of that statute but at most it occupies merely the position of an antecedent encumbrancer whose lien or mortgage is invalid because not acknowledged or recorded, and that, on the contrary, plaintiff is a third person within the meaning of that statute, being a subsequent purchaser or encumbrancer for value without notice of any of the rights or interest of the defendant.

The cause was tried to a jury, and, after the conclusion of all the testimony, the trial court refused instructions in the nature of a demurrer to the evidence offered by the defendant as to each of the three counts in plaintiff's petition and gave a peremptory instruction to find for the plaintiff on each of the three counts in plaintiff's petition, leaving only to the jury the question of amount of damages, and the jury returned a verdict in favor of the plaintiff on the first count in the sum of $661.20 and on the second count in the sum of $780.13 and on the third count in the sum of $669.39, aggregating $2110.72, on which a judgment was rendered and defendant, after an inffective motion for a new trial, brings the cause to this court by appeal for review.

We will, for the purpose of clarity, refer to the parties to this suit as plaintiff and defendant instead of appellant and respondent.

There is practically no dispute as to the essential and determinative facts involved in this appeal. The Oakland Motor Car Company is a subsidiary of the General Motors Corporation and was engaged in the manufacture of Pontiac and Oakland Brougham cars and the three cars were furnished by the Oakland Motor Car Company under a bill of sale, a trust receipt and a promissory note, of which the following are copies:

"Bill of Sale

"General Motors Acceptance Corporation

"Know all Men by These Presents, that the undersigned for valuable considerations does hereby grant, sell, transfer and deliver unto the General Motors Acceptance Corporation (Grantee) the following Motor Vehicles:

"(Description)

"Dealer's Name and Address: Larsh Brokaw Motor Company,
     "Alton, Ill.

"To have and to hold all and singular the said goods and chattels to said grantee, its successors and assigns. The undersigned covenants with said grantee that undersigned is the lawful owner of said chattels; that they are free from all encumbrances; that undersigned

has a good right to sell the same; that undersigned will warrant and defend same against the lawful claims and demands of all persons.

"Witness the hand and seal of the undersigned this ...... day of ..............., 19....

"Witness:

"OAKLAND MOTOR CAR CO. ...........................

"Division of General Motors Corporation.

" (Shipper)                    (L. S.)

"Trust Receipt.

"Received of General Motors Acceptance Corporation, the Motor Vehicles described above. I (we) hereby acknowledge that said Motor Vehicles are the Property of Said General Motors Acceptance Corporation and agree to take and hold the same, at my (our) sole risk as to all loss or injury, for the purpose of storing said property; and I (we) hereby agree to keep said Motor Vehicles brand new and not to operate them for demonstrating or otherwise, except as may be necessary to drive said Motor Vehicles from freight depot or from above city to my (our) place of business with all due care at my (our) risk en route against all loss and damage to said Motor Vehicles, Persons or Property, and except as I (we) may be allowed by you in a special case to use the same for demonstrating upon our compliance with the conditions expressed in your instructions to us, and to return said Motor Vehicles to said General Motors Acceptance Corporation or its order upon demand; and pay and discharge all taxes, encumbrances and claims relative thereto. I (we) hereby agree not to sell, loan, deliver, pledge, mortgage, or otherwise dispose of said motor vehicles to any other person until after payment of amounts shown on Dealer's Record of Purchase and Release of like identification number herewith. I (we) further agree that the deposit made by me (us), in connection with this transaction, may be applied for reimbursement for any expense incurred by General Motors Acceptance Corporation, in the event of breach of this Trust or repossession of said Motor Vehicles.

"It is further agreed that no one has authority to vary the terms of this Trust Receipt.

"Executed this .... day of ............, 19...., at Alton, Ill.

"Larsh Brokaw Motor Co. (Dealer)

"By H. T. Brokaw, Secy. (Official Title if Company)"

"Promissory Note.

"Four Months after date, for value received, I (we) promise to pay to the order of General Motors Acceptance Corporation at their office, St. Louis, Mo. (amount) with interest at 6% per annum from the date hereof.

"In case of default, I (we) hereby authorize, irrevocably, any attorney-at-law to appear for me (us) in any court of record in the United States, and waive the issue and service of process and confess a judgment against me (us) in favor of the holdier hereof, together with costs.

"And I (we) agree, in the event this note is placed in the hands of an attorney for collection, to pay 15% of the amount due hereon as attorney's fees or, if prohibited, the amount permitted by law.

"And I (we) hereby waive all benefits of valuation, appraisement and exemption laws, and all rights of appeal and release all errors.

                    "Larsh-Brokaw Motor Co. (Dealer)
                    "By H. T. Brokaw, Secy.
                        "(Official title of Company)"

The testimony shows that the general custom was that when cars ordered from the factory would be shipped, by previous arrangement, the bill of lading would be sent to a bank in Alton, Illinois, and, upon notification, a representative of the Larsh-Brokaw Motor Company would go to said bank and sign a check for ten or fifteen per cent of the purchase price of the automobiles, being the down payment, and sign a promissory note for the balance owing on the shipment in favor of the defendant, and a trust receipt, which is attached to a bill·of sale from the manufacturer to the defendant. Then the bill of lading would be delivered to said representative, the automobiles would be taken from the railroad company and put either in the warehouse or on the showroom floor of the Larsh-Brokaw Motor Company for sale.

There were no signs or tags on the cars in controversy while in the possession of the dealer to indicate that they were owned by the defendant. The representatives of the defendant frequently went through the place of business of the Larsh-Brokaw Motor Company and checked up on the cars in which it was interested as owner under its trust receipts and saw them being displayed in the showroom and offered for sale to the public. The Larsh-Brokaw Motor Company would sell cars upon which defendant held trust receipts before paying the amount of the promissory note due to the defendant thereon, and before obtaining release from the trust receipts; and sometimes when it sold a car it would not account to defendant for the amount owed to defendant on that particular car until such time as the note might thereafter fall due, and the general practice was that the Larsh-Brokaw Motor Company first sold the car upon which the defendant held a trust receipt, and then later, sometimes as long as ten days thereafter, settled with the defendant for the amount it owed on that particular car. This practice continued from the time the Larsh-Brokaw Motor Company began business in March, 1926, until it went out of business in the latter part of November, 1929.

The Larsh-Brokaw Motor Company was the recognized dealer and distributor for Oakland and Pontiac cars, and, ordinarily financed them through the defendant. In addition to its Alton, Ill., plant it had a branch plant at Jerseyville, Illinois.

Plaintiff did a commercial and an automobile financing business and purchased negotiable paper from automobile dealers in St. Louis and vicinity and in Illinois, taking as security in Missouri chattel mortgages and in Illinois conditional sales agreements. In the Illinois business the dealer would ordinarily pay cash to the manufacturer for the cars ordered by him, a finance company furnishing the money, and taking from the dealer his promissory note for the amount so furnished, secured by a trust receipt, and when the dealer sold a car, against which a trust receipt was held, he was expected to settle with the holder of the trust receipt for the amount due on that particular car.

Usually, where a sale was made on time, the buyer made a small cash down payment and gave his note to the dealer for the balance of the purchase price securing its payment by executing a conditional sales agreement. This note and conditional sales agreement would usually be sold by the dealer to a finance corporation engaged in business similar to that engaged in by both plaintiff and defendant.

In the instant case, cars ordered from the factory by the Larsh-Brokaw Motor Company were usually financed through the defendant, but not always. Plaintiff, as well as several other companies, financed much of the business of the Larsh-Brokaw Motor Company. For a brief time plaintiff was, or thought it was, financing all the business of the Larsh-Brokaw Motor Company. H. T. Brokaw, Secretary and treasurer of the Larsh-Brokaw Motor Company, testified as follows: "I think I told a representative of General Motors Acceptance Corporation we were disposing of some of our retail paper to other finance companies."

Defendant took possession of the three cars in controversy under its trust receipts on November 23, 1929, and the Larsh-Brokaw Motor Company made an assignment on December 5, 1929. The Larsh-Brokaw Motor Company had sold the three cars in controversy as follows: The Pontiac four-door sedan mentioned in the first count of the petition to M. O. Newlin, one of its salesmen; the Pontiac car described in the third count of the petition to C. W. Brueggeman, another one of its salesmen; and the Oakland Brougham described in the second count of the petition to E. H. Larsh, president of the Larsh-Brokaw Motor Company.

Each of the three buyers executed a note for the purchase price of the car bought by him, the agreement in respect thereto, and the Illinois Conditional Sales Agreement, and the Larsh-Brokaw Motor Company also signed the agreement in respect to the note with each

buyer and the Illinois Conditional Sales Agreement with each buyer, and also executed the "Seller's Assignment" to plaintiff, as the purchaser of the note, the property, the conditional sales contract as to each of the three cars, on the form hereinafter set out and delivered all the papers to plaintiff before the maturity of the note. The following are copies of the papers in the Newlin purchase:

"'Negotiable Instrument.

"Schedule of Payments.

"$31.00 due one month after date.

"$31.00 due two months after date. .

"$31.00 due three months after date.

"$554.90 due four months after date.

"$647.90                                        "Alton, Illinois,

                                                "August 21, 1929.

"For value received, the undersigned, jointly and severally, promise to pay to the order of the undersigned Six Hundred Forty-Seven & 90/100 Dollars at the time or times stated in the Schedule of Payments hereon, at the office of Merchants and Manufacturers Securities Co., Chicago, Ill., or at the office of the legal holder of this note, with interest after maturity at the highest legal rate, together with exchange and collection charges at current rates.

"If any installment of this note is not paid at the time and place specified herein, the entire amount unpaid shall be due and payable forthwith at the election of the holder of this note. The acceptance of any installment hereof by the holder after the time when it becomes due as herein set forth shall not be held to establish a custom, or waive any rights of the holder to enforce prompt payment of any further installments or otherwise.

"And the undersigned hereby jointly and severally authorize, irrevocably, any attorney of any Court of Record to appear for the undersigned in such court, in term time or vacation, at any time hereafter and confess a judgment or judgments without process, in favor of the holder hereof for such amount as may appear to be unpaid or declared due and payable hereon, together with costs and twenty per cent of the balance due or declared due and payable as attorneys' fees, and to waive and release all errors which may intervene in any such proceedings, and consent to immediate execution upon such judgment, hereby ratifying and confirming all that said attorney may do by virtue hereof.

"This note is secured by Conditional Sales Agreement of even date herewith.

                    "Name   M. O. NEWLIN,

                              "(Buyer sign here)

              "Address   797 Park Drive, Alton, Illinois.

                    "(Reverse Side)

912

"For value received, we, and each and all of the endorsers hereon, jointly and severally guarantee payment of the within note, accepting all its provisions authorizing the maker, without notice to us or either of us, to obtain an extension or extensions in whole or in part and waiving presentment for payment, demand, protest and notice of protest and nonpayment; also agreeing that in case of nonpayment of principal or interest when due, such arrearage may be offset by application of any amount or amounts, whole or in part, which may be due any of us from the holder of such note and suit may be brought by the holder of this note against any one or more or all of us, at the option of said holder, whether such suit has been commenced against the maker or not and that in any such suit, the maker may be joined with one or more or all of us, at the option of the holder.

"If this note, or the interest, is not paid when due, then the amount remaining unpaid hereon shall, without notice, become immediately due and payable, at the option of the holder. The acceptance of any installment hereof by the payee after the time it becomes due shall not be held to establish a custom and shall not relieve the endorsers of liability or waive any rights of the holder.

"The holder of this note shall not be required to look to the security for the payment of this note, but may proceed against us, or either or all of us, immediately upon default in payment, or otherwise.

"And I, or we, hereby jointly and severally authorize, irrevocably, any attorney-at-law to appear for me or us in any court of record in the United States, in term time or vacation, and waive the issue and service of process and confess a judgment against me or us at any time hereafter in favor of the holder hereof, for such amount as may appear to be unpaid or declared due and payable hereon, together with costs and twenty per cent of the amount due or declared due and payable hereon, as attorney's fees and to release all errors and waive all right of appeal.

"M. O. NEWLIN,
"(Buyer sign here)

"Larsh Brokaw Motor Company,
"By H. T. Brokaw, Sec'y."

"Merchants and Manufacturers Securities Co.,
"231 South LaSalle St., Chicago.
"Illinois Conditional Sale Agreement.

"This Agreement, made this 21st day of August, 1929, between Larsh-Brokaw Motor Company (Seller's Name) of 420 Belle Street, Alton, Illinois (Seller's Address), first party, his or its successors, or assigns (hereinafter called "Seller"), and M. O. Newlin (Buyer's Name) of 797 Park Drive (Buyer's Street Address) Alton, Illinois

(Buyer's Town and State), Second party (hereinafter called "Buyer").

"Witnesseth:—That the Seller in consideration of the payments, agreements and conditions contained herein which on the part of the Buyer are to be made, done and performed has this day delivered and agreed to sell to the Buyer and the Buyer has this day agreed to buy from the Seller, but upon the conditions hereinafter recited, the following Passenger or Commercial Car, or Tractor (hereinafter called the "Car"). Make—Pontiac, Type of Body—4 Dr. Sedan, Model Letter or Number—, Manufacturer's Serial No. 557087, Motor No. 633901, Cyl. No. 6, Year Model—1929, List Price—, Cash Selling Price—$734.00.

"With the equipment thereon and including all charges for the price of Seven Hundred Sixty-one & 90/100 ($761.90) (Total time price) of which the Buyer has paid $114.00 in cash and $—— in trade, totaling ($114.00) Total down payment, leaving a Deferred Balance of Six Hundred Forty-seven & 90/100 ($647.90) Amount of Note, which the Buyer agrees to pay to the Seller, or assigns, in 4 successive monthly installments commencing one month from the date hereof.

"The purchase price is further evidenced by the negotiable note signed by the buyer, payable in monthly installments as aforesaid and the buyer hereby agrees that the holder of said note may detach same from this agreement and enforce all rights thereunder the same as though this agreement were not attached thereto. The remedy afforded by enforcing payment of said note shall be cumulative with all other remedies of the legal holder hereof.

"The buyer agrees that the Seller may proceed with any and all remedies afforded by this agreement and with any action on said note, concurrently.

"Any extensions of payment granted by the holder shall not be a waiver of any right of the holder hereof, nor shall any waiver of any default operate as a waiver of any subsequent default. Time is the essence of this contract.

"Title to this car and extra equipment shall not pass by delivery to the buyer but shall remain vested in and be the property of the seller or assigns until the purchase price has been fully paid. Buyer hereby acknowledges receipt of and accepts the Car, having first examined and tested the same and found same in sound and first class condition, and the loss, injury or destruction of said Car shall not release said Buyer from payment as provided herein.

"The buyer agrees that he will not use said Car in violation of any ordinance, statute or act of Congress; will not permit said Car to be used for passenger hire; will keep the same in good order and repair at Buyer's own expense; will not remove said Car from the

County wherein Buyer now resides nor from the State of Illinois without first obtaining the written consent of the holder hereof; will not sell or attempt to sell, secrete, encumber, misuse or abuse said Car; will at all times keep same insured against fire and theft for the full insurable value, in a company acceptable to seller or assigns, and will deposit the policies with Seller or assigns; will pay all installments due hereunder punctually; will exhibit Car to Seller or assigns, or their agent at all times on demand. The Buyer agrees that in the event of breach of any of the foregoing covenants and agreements by the Buyer or in the event that the legal holder hereof, at any time, in its sole judgment feels unsafe or insecure, or fears removal or diminution, or in the event of the failure by the Buyer to pay the installments as above set forth, then, and in either of said events, the legal holder hereof shall have the right to declare, without notice, all the remaining installments immediately due and payable, and shall thereupon have the right to take immediate possession of said Car wherever found, with or without process of law, and without first making any demand therefor (demand being expressly waived). Upon securing possession of said Car the Seller or assigns are hereby given full power and authority to sell and dispose of said Car without notice for the highest price obtainable and out of the proceeds of said sale the Seller or assigns are hereby empowered to pay the expense of repairing and reconditioning said Car, cost of recovering possession, expense of sale, court costs, bond premiums and reasonable attorney's fees, installments and interest due. In the event that the proceeds of said sale are insufficient to pay the above Buyer agrees to pay the deficiency forthwith.

"This agreement shall apply to and bind the heirs, executors, administrators and assigns of the Buyer, and shall insure to the benefit of the Seller, Seller's heirs, executors, administrators, successors and assigns, and contains the entire agreement between the parties hereto, their agents or employees, either verbal or written.

"In Witness Whereof, the parties hereto have set their hands and affixed their seals to this Agreement, the day and year first above written.

"M. O. NEWLIN,
"Buyer sign here)
"LARSH-BROKAW MOTOR COMPANY,
"(Seller sign here)
"By H. T. BROKAW, Secy.

"Witness:
"L. L. EVANS,
"Address: 318a Prospect St.".
"Seller's Assignment.

"For value received, the undersigned does hereby sell, assign and transfer to Merchants and Manufacturer's Securities Co., Chicago, Illinois, its successors or assign, the undersigned's right title and interest in and to the within contract and the property covered thereby and the note mentioned therein, authorizing the said company to collect and discharge same.

"The undersigned hereby represents that all statements contained in the within contract made by the purchaser (buyer) of said automobile are true; that all statements made by the undersigned to the Merchants and Manufacturers Securities Co. in connection with said contract are true; that there are no liens against the within described automobile; that the Motor and Serial numbers stated therein are accurate and correct; that no part of down payment consists of notes or post-dated checks; that there is no difference or dispute in relation to the consideration of the debt evidenced by said contract and note; that the said contract and note was received by the undersigned to evidence a balance of the purchase price of said automobile; that said contract was received by the undersigned as evidence of the retention of title and the existence of a balance of the purchase price for the automobile described in said contract; that the signatures of the buyer (s) and/or endorser (s) of note is/are genuine; that the buyer (s) have legal capacity to contract; that the undersigned makes these representations for the purpose of inducing Merchants and Manufacturers Securities Co. to purchase the within contract.

"In witness whereof said undersigned hereunto subscribed his, its, or, their names this 21st day of August, A. D. 1929.

"Firm Name of Dealer LARSH-BROKAW MOTOR
"COMPANY, (Seal)
"Official's Name and Title H. T. BROKAW,
"Secy. (Seal)"

It will thus be seen that the plaintiff acquired the title to all three of the cars which had been sold to Brueggeman, Newlin and Larsh, by papers set out practically in full in the Newlin purchase and similar papers in the other two purchases.

It will be noted that there is contained in the seller's assignment, which is executed by the dealer, Larsh-Brokaw Motor Company, the following clause: "That there are no liens against the within described automobile." There is no testimony to the effect that plaintiff, when purchasing the notes and the cars from the Larsh-Brokaw Motor Company, had any knowledge whatever of the trust receipts held by the defendant. The defendant contends that plaintiff should have made inquiry of the Larsh-Brokaw Motor Company people to ascertain whether or not there were any trust receipts or other liens against the automobiles and claimed if such inquiry had been made

the Larsh-Brokaw Motor Company people would have given it the true facts, to-wit, that there were outstanding trust receipts against the three automobiles. We cannot agree with this contention.

In the seller's assignment paper executed by the Larsh-Brokaw Motor Company there is written assurance that there are no liens against the automobile described therein. Mr. Schulein, general manager for the plaintiff in the automobile department, on being interrogated, stated that the plaintiff's deals with dealers would, in a month's time, range up into hundreds of thousands of dollars and would, perhaps, represent one hundred dealers; that he didn't ask if any trust receipts were filed on the cars; that the dealer guaranteed to plaintiff on his own paper that there were no trust receipts or other receipts or other obligations on the cars and that it would be a silly question to ask dealer if there were trust receipts on them, he would say no; that plaintiff wouldn't buy any paper that didn't look one hundred per cent clear.

Defendant also contends that plaintiff should have consulted it before purchasing the three cars in controversy as to whether defendant had a trust receipt against them. We cannot agree with this contention.

Plaintiff and defendant were competitors in the same business. Besides there were other finance companies with whom the Larsh-Brokaw Motor Company had been doing business and by reason of the written assurance of the Larsh-Brokaw Motor Company that there were no liens against the cars in controversy we do not think plaintiff would be required to interrogate all the different companies with whom the Larsh-Brokaw Motor Company had done business. That would certainly be an unreasonable requirement to make and would seriously disturb methods of transacting business.

We have arrived at the conclusion that under the conceded facts, as shown by the testimony, plaintiff acquired title to the notes of the three purchasers and the three automobiles, without any knowledge or notice of any infirmity in the notes, or of liens, secret or otherwise, on the automobiles, or of any restrictions on the right of the dealer to sell them, and became thereby the bona fide owner of the three automobiles. So that we have this situation in respect to the three automobiles in controversy: The plaintiff in good faith became the owner of same as an innocent purchaser; the defendant also in good faith at a prior time became the owner of same. The question to be determined then, is, which one of the two innocent parties must suffer on account of the fraud of the Larsh-Brokaw Motor Company. The general rule is thus stated in 12 R. C. L., sec. 149, p. 401, as follows: "Where one of two innocent persons must suffer from the fraud of a third, he who furnishes the means to commit it, or whose negligence enabled the third party to commit it must

bear the loss. [Anderson v. Warne, 71 Ill. 20, 1. c. 22; Western Union Telegraph Co. v. Schriver, 141 Fed. 538; Baker v. Hallam, 103 Iowa, 43, 72 N. W. 410; Allen v. South Boston R. R. Co., 150 Mass. 200.]

It is very apparent that the defendant did not mean to restrict the Larsh-Brokaw Motor Company from selling its cars as set out in the trust receipt, because our common sense would dictate that cars stored in a building without being exhibited for sale would be a very unusual, unprofitable and inadvisable way to do business. Cars are manufactured for sale to the public, and, while the trust receipt provides that the dealer, Larsh-Brokaw Motor Company, should merely store the property and should not operate the cars for demonstrating of otherwise unless by special permission, and should not ''sell, loan, deliver, pledge, mortgage,'' or otherwise dispose of said cars except by first getting permission from defendant so to do, and paying in advance the amount due defendant thereon, yet it is very apparent that these instructions were not intended in good faith and that nothing would please the holder of the trust receipts better than for the dealer to break these instructions and make speedy sales of the cars. In other words, paraphrasing Shakespeare, the instructor would feel that his instructions would be more honored in their breach than in their observance. We are driven to the conclusion, by reason of the uniform custom as shown by the testimony, of the defendant permitting the Larsh-Brokaw Motor Company to display the defendant's cars for sale and to sell them first, and then settle with it thereafter when it suited the convenience of the dealer to do so, that the defendant clothed the dealer with apparent ownership and authority to sell the cars as they were the dealer's cars, and thereby put the dealer in a position to perpetrate a fraud which must result in a loss either to the buyer or to defendant.

Defendant also had information that it was the custom of the dealer (Larsh-Brokaw Motor Company) to sell some of its retail papers to other finance companies. In Gordon Motor Finance Company v. Aetna Acceptance Corporation, 261 Ill. App. 536, 1. c. 540, the court, in discussing the Uniform Sales Act, uses this language:

''However, we do not believe the protection of the statute should be extended to those who, by their own acts, place the *indicia* of ownership in a person or corporation under circumstances where it can be reasonably foreseen that fraud on innocent persons will result therefrom.''

Defendant also urges that inasmuch as the three cars were sold to an officer of the Larsh-Brokaw Motor Company and to two of its salesmen that they might have knowledge of the existence of the trust receipt in the hands of defendant and thereby undermine plaintiff's title to the property. We do not agree to this contention.

It is shown by the evidence that it is very usual for salesmen to

buy new cars in which they could demonstrate to prospective buyers and, before the time for final payment, which was usually the largest payment, would arrive, they could make sale of their car and then buy another new one, and so on. The salesmen would not necessarily have knowledge of the existence of any trust receipt against any of the cars because that was out of their line. As stated, none of the cars were tagged or had anything on them to give the public any idea that they were owned by anyone other than the dealer. The sale to E. H. Larsh, the president of the company, would probably stand on a different footing in the event Larsh himself was complaining about having been sold a car against which there was a trust receipt outstanding, because he would be presumed to know there was.

In National Bond & Inv. Co. v. Shirra, 255 Ill. App. 415, the automobile was first sold by the dealer (a corporation) to one of its officers, and resold to plaintiff who had no knowledge of a secret lien and the court held plaintiff's title better than the vendor's secret lien.

Defendant cites the case of Nail v. General Motors Acceptance Corporation, 266 Ill. App. 623, as authority for the alleged infirmity in plaintiff's title. We do not, however, deem that case in point. Nail had been an officer and stockholder in the company which sold him the car and had sold his stock in the company shortly prior thereto, taking its note for the sale price of the stock, and was plaintiff in the suit against the present defendant. The appellate court, in that case, set out Nail's testimony and reached the conclusion therefrom that he had knowledge of the trust receipt being held by the defendant against the cars which he purchased from the corporation, basing it upon his testimony and his intimate connection with the corporation. That case, therefore, differs from the instant case in this: that Larsh, the original buyer from the Larsh-Brokaw Motor Company, is not the plaintiff in this case, and, is not seeking to recover damages. If he were the plaintiff in the instant case the authority cited by the defendant would be applicable. But Larsh himself, being president of the company, was, no doubt, a factor in deceiving the plaintiff as the company, of which he was the president, actually represented to the plaintiff over its signature that there were no liens against these cars in controversy.

The fact of Larsh, the president, as an individual, buying a car from the corporation, would, in and of itself, tend to give plaintiff additional assurance that there were no liens on the car held by the defendant or by anybody else, because presumptively the president would know of these facts and would not purchase a car to which his corporation had no title, and which, necessarily, could make none

to him. Under these circumstances we cannot accede to the claim urged by defendant that it was the plaintiff's duty to interrogate representatives of the Larsh-Brokaw Motor Company in respect to liens before investing its money in the negotiable papers and the cars.

It is very apparent, as we look back, that the Larsh-Brokaw Motor Company was taking advantage of the position which defendant had, through its negligence, put it in, of being the apparent owner of the cars and having the right to sell same as its cars and was selling to the public accordingly, and, any inquiry as to liens, if answered truthfully, would spoil the sale.

Nothing could be more binding than the written assurance contained in the assignment of the conditional sales agreement that there were no liens against the automobiles. The written or printed statement has more potency than the oral one. The former carries more weight than the latter. Practically all important business transactions are, for that reason, reduced to writing rather than being permitted to rest on oral understandings. This distinction is recognized in determining the difference between libel and slander. Many things uttered by word of mouth are held not to be slanderous, whereas the same things put in writing or printing are held to be libelous. This holding is based on maxims such as these, "The spoken word flies; the written letter remains," and, "Oh, that mine enemy would write a letter." [Orchard v. Printing Co., 240 Mo. 575, l. c. 591, 144 S. W. 812; Ukman v. Daily Record Co., 189 Mo. 378, l. c. 391, 88 S. W. 60; Becker v. Brinkoff (St. L. Ct. of App.), decided Feb. 5, 1935, and not yet reported.]

It is manifest that defendant by its conduct clothed the Larsh-Brokaw Motor Company with all the *indicia* of ownership. Defendant concedes in its brief that had any member of the uniformed general public purchased any one of the three cars in controversy from the Larsh-Brokaw Motor Company that it (defendant) would be estopped from denying the dealer's authority to sell, but claims that plaintiff does not belong to that class; that it is a business company and bought the cars, the notes and the conditional sales contracts as an investment and is not, therefore, entitled to the same protection as the ordinary buyer; that it relied solely on the integrity and credit of the Larsh-Brokaw Motor Company to indemnify it against loss. This seems like "the pot calling the kettle black." Defendant, for business reasons and hope of profit, held secret trust receipts against cars intrusted by it to Larsh-Brokaw Motor Company, and, likewise, trusted in the integrity of that dealer to protect it. The dealer proved false to his trust and defendant, by its negligent conduct in its dealings with the dealer, clothed it with apparent ownership and right of disposal so that it did per-

petrate a fraud on plaintiff, an innocent purchaser. It does not seem within the bounds of reason that plaintiff would have invested its money in the cars if it had any reason to suspect that defendant or anyone else held a trust receipt against them. No good business concern is desirous of buying a lawsuit. So that, the loss should fall on the one who, by conduct such as shown in the instant case, made it possible for the fraud to be committed.

So we hold, under the facts of the instant case, and in consonance with the holdings of the Illinois Courts on kindred questions arising out of the Uniform Sales Act of that State, that the defendant is precluded by its conduct from denying the authority or right of the Larsh-Brokaw Motor Company to sell the cars in controversy and is estopped from claiming any interest in them. [Illinois Bond & Investment Company v. Gardner, 249 Ill. App. 337; National Bond & Investment Company v. Shirra, 255 Ill. App. 415; Gordon Motor Finance Company v. Aetna Acceptance Company, 261 Ill. App. 536; Smith-Hurd Rev. St. (Ill.), Chapt. 121½, secs. 20 and 23; General Securities Corporation v. Reo Motor Car Company, 91 Cal. App. 16, 266 Pac. 576; Drain v. La Grange State Bank, 303 Ill. 330.]

We are also of the opinion that under the proven and uncontroverted facts in the case, the question of estoppel became one of law and the court properly instructed the jury to find a verdict in favor of the plaintiff, leaving it only to determine the amount of damages.

In Illinois Bond & Investment Company v. Gardner, 249 Ill. App. 337, l. c. 345, a case involving the question of estoppel under the Uniform Sales Act, the point was made by the appellant that the trial court should have submitted the issue of estoppel to the jury instead of directing a verdict, and the court, in overruling that contention, used the following language:

"Ordinarily this is the correct rule, but where the facts are not in dispute, and only one conclusion can be reached from the facts in evidence, then it becomes a question of law for the court to say whether or not, under the facts as presented, the appellant in this case has been estopped from asserting its rights as claimed by their secret lien, under the Uniform Sales Act, Cahill's St., ch. 121a, par. 26, as against an innocent third party. 'Where there is no dispute about the facts and only one inference can be drawn, it is a question of law whether or not the facts proved constitute an estoppel.' [21 Corpus Juris, page 1253.]"

It therefore becomes unnecessary to consider the matters urged by defendant in respect to the refusal of its instructions.

It is, therefore, ordered that the judgment of the trial court be, and the same is, affirmed. *Becker* and *McCullen, JJ.,* concur.