George **RODGERS**, Appellant,

v.

**SEIDLITZ PAINT AND VARNISH COMPANY, a Missouri corporation, and Conchemco, Incorporated, a Missouri corporation, Respondents.**

No. 51386.

Supreme Court of Missouri, Division No. 2.

June 13, 1966.

Motion for Rehearing and to Modify Judgment Denied July 11, 1966.

Fain & Rea, Charles J. Fain, Peter H. Rea, Branson, William L. Mason, Jr., Galena, for appellant.

Theodore C. Beckett, Hudson Lee McGuire, Jr., Kansas City, Brewer & Myers, Kansas City, for respondents.

EAGER, Presiding Judge.

Plaintiff, George Rodgers, sued to recover commissions which he claimed were due to him with interest, for services rendered to defendants from November 1, 1958, to April 1, 1962, when his employment terminated. The jury found in his favor for the full amount of such commissions $17,663.22, but disregarded the question of interest. Upon after-trial motion of defendants the trial court set aside the judgment and entered judgment for the defendants "for the reason that, under the law and the evidence, plaintiff is equitably estopped from asserting his claim." It appears that "Conchemco, Inc." was the product of a change of name upon merger of Seidlitz with others, that a division is still operated as Seidlitz Paint and Varnish Company, and that the defendants are, in fact, "one and the same company," as stipulated. We shall, for convenience, refer to defendant in the singular, or perhaps to "Seidlitz," although the judgment is actually for the "defendants." The petition originally consisted of two counts but the second count was dismissed. It will not be necessary to digest the pleadings; plaintiff was permitted to file and did file, after verdict, an amended petition to conform to the evidence. Defendant denied all of plaintiff's substantive allegations, and pleaded accord and satisfaction and that plaintiff was estopped by the knowing acceptance of compensation under and upon a changed basis. The only real issue here is whether a submissible case

was made by plaintiff, or whether the court was correct in deciding that there was an estoppel as a matter of law.

As of December 1, 1952, plaintiff was employed by defendant as Manager of a so-called "Industrial Finishes Division," which, in fact, he was to create. The terms of his compensation, as expressed in a letter from defendant, were: an annual salary of $12,000, the sum of $3,000 per year for expenses in the Kansas City Metropolitan Area (with some inference that this could be drawn regardless of his actual expenses), his actual expenses elsewhere, and a commission of 3% "on all sales credited to the Industrial Finishes Division in excess of $250,000 annually." At that time the fiscal year ran from December 1 through November 30; it was later changed so as to run from November 1 through October 31. Plaintiff had been for a number of years an officer of a corporation engaged in that particular type of work in the Chicago area. His contacts in effecting this employment were with Mr. G. R. Seidlitz, Vice President and General Manager, who was generally known as "Dick" Seidlitz. Plaintiff immediately began his work in Kansas City, established a laboratory, gradually built up a sales force, and actively solicited the trade himself. Actually, he started from "scratch," with a new line of products. For several years the results were somewhat disappointing; for instance, in the fiscal year ending in 1957 total sales were $139,880.03, and in 1958, $230,322.25. The fiscal year ending in 1959 was the first one in which total sales exceeded $250,000; they were then $274,908. In 1960 they were $316,073 (for eleven months of the changed fiscal year); in 1961, $576,967, and for five months to April 1, 1962 (the end of plaintiff's duties as Manager) $274,991. At no time was plaintiff paid a 3% commission.

In November, 1957, defendant circulated a memorandum dealing with the attitude of the Internal Revenue Department on expense accounts. For this, and perhaps other reasons, plaintiff had an interview with Mr. G. R. Seidlitz (about whose authority there is no question) in December, 1957, probably about December 18. Much controversy has arisen over the substance and result of that interview. Plaintiff testified that he asked Mr. Seidlitz to change the $3,000 allowance for Kansas City expenses to straight salary, and that Seidlitz agreed; he further testified that they did *not* discuss the 3% commission on any question of a *bonus*; that thereafter he reported his actual expenses in the Kansas City area and elsewhere and received payments therefor. Mr. Seidlitz testified by deposition: that plaintiff originally suggested the $3,000 expense allowance; that in December, 1957, they had the preliminary figures of plaintiff's division for the fiscal year, that the sales had risen, but rather slowly, and that he and plaintiff discussed "the desirability of placing him on a compensation basis exactly the same as * * all other executives"; that his salary base was changed to $15,000, his actual expenses were to be paid and he was "placed upon our key employee bonus arrangement" starting in fiscal 1958; that the bonus terms were discussed; that plaintiff assented to the new arrangement, and that it went into effect as of December 1, 1957. While we do not find that Mr. Seidlitz specifically testified that the 3% commission was eliminated at that conference and in the new arrangement, such is the almost necessary inference from his testimony. Thus, the factual controversy arises, plaintiff insisting that he was still entitled to the 3% commission when earned, and defendant insisting that it was wholly eliminated by the December, 1957, arrangement.

Beginning as of December 1, 1957, plaintiff received regularly the installments of a $15,000 salary, plus all his actual expenses. No bonuses were paid for the fiscal year 1958, nor would plaintiff have been entitled to any commission on sales; shortly after the end of fiscal 1959 he was sent a check for $750, with a form letter

presumably indicating that this was a bonus; he accepted the check and his explanation at the trial was that the amount was substantially the same as the commission to which he was entitled ($747.24) and that he accepted it as such. Following the 1960 fiscal year (ending October 31, 1960), he was sent a bonus of $750 and accepted it; a 3% commission for that year would have been $1,982.19. Plaintiff's explanation for the acceptance of that check was that "we were very busy. Seidlitz was merging at the time, going into these things, and I thought I was being considered for a top job in the corporate structure, and I thought that this time was a very poor time to start rocking the boat, and that was why I did not make a demand at that time." Subsequently, and entirely inconsistently, plaintiff testified that he did not get a bonus for 1960, but plaintiff's brief *concedes* the payment of a 1960 bonus in the amount of $750. Following the 1961 fiscal year plaintiff received a bonus check for $1,500, which he accepted; a 3% commission would have been $9,809.01.

It is most difficult to tell from plaintiff's testimony just when he made any complaint concerning his compensation or any demand for commissions. The only formal demand he made was apparently on June 30, 1962, about three months after he was "fired," and on that date his compensation ceased. Defendant had continued to pay his compensation for three months after he was relieved of his duties in order to give him an opportunity to find other employment. Although much was made of the "date of the demand," we are not so much concerned with that matter as we are with ascertaining when plaintiff first made *complaint* of the new arrangement for compensation. At some time prior to March, 1962, plaintiff was "angry" and went to "Dick" Seidlitz's office and talked with him; his testimony indicates that he then discussed the 3% commission matter and his failure to receive commissions, also the "money" problems generally, and the "unsatisfactory relations" due to the fact that he had not been

paid; he also stated that he told Mr. Seidlitz that he was doubtful whether he wished to remain with the company. No understanding was arrived at, and he did not quit the employment at that time. He testified that he "felt" that this conversation was the primary reason he was fired, but the evidence indicates that the attitude of some of the affiliated company officials in Baltimore also entered into the termination. No complaint was shown to have been made of plaintiff's work at any time. In March, 1962, and probably around the first of March, "Dick" Seidlitz called plaintiff in, told him that "there was dissatisfaction in Baltimore" concerning him (Baltimore being the location of one of the affiliates) and that he was forced to let plaintiff go. His duties ceased as of April 1. Mr. Seidlitz thereafter wrote four letters of recommendation for plaintiff to other companies in the same line of business; he testified that plaintiff had never made any demand for the 3% commission.

The treasurer of defendant testified that after the December, 1957, conference, plaintiff was placed on the "key employee bonus list," and that he discussed the new system of compensation with plaintiff. The President testified that he had, on one or two occasions after the end of the fiscal year, discussed compensation with plaintiff, as with the other executives, and that the 3% commission matter was not "brought to my attention." The Treasurer of the Seidlitz Division of Defendant produced exhibits purporting to show what plaintiff would have received from the beginning of fiscal 1958 to the time of his termination, had he been paid in accordance with the original 1952 agreement, along with a compilation of the payments actually made to him. One, Defendant's Exhibit 17, showed that he had actually received $95,460.42 for this period, whereas a continuation of his 1952 contract (with the 3% commission in lieu of bonus) would have called for $95,503.07. From Exhibit 13 the witness calculated that plaintiff had been overpaid $4,749.13 by comparison with his 1952 contract. We do

not consider these as controlling or particularly persuasive, for they are based upon the continuation of a $12,000 annual salary, whereas plaintiff and defendant agree that the salary was raised to $15,000; plaintiff contends (and therein lies the controversy) that this raise was granted in *addition* to the continuation of the 3% commission provision, which defendant denies. Apparently, these exhibits were offered on the theory of an accord and satisfaction. The trial court did not decide the case on that theory, and it has not been briefed here on that theory. The testimony of the treasurer also left in some doubt the amounts actually due and paid to plaintiff prior to December, 1957 for his Kansas City expenses, on which he was apparently entitled to an arbitrary amount of $3,000, if he chose to draw it. These exhibits, compiled from the records, do show bonus payments of $750, $750 and $1,500 for the years 1959, 1960 and 1961. Those items are material for another reason.

At the time the court entered judgment for defendant, it also overruled defendant's alternative motion for a new trial. There was no appeal by defendant, and thus no question of specific error is involved. The question of estoppel was submitted to the jury in an instruction offered by defendant, in which the essential submission was (1) that plaintiff knew that for 1959, 1960, 1961, and until his termination in 1962, he would have been entitled to commissions under his original agreement; (2) that defendant believed that the commission agreement had been rescinded; (3) that plaintiff knew that defendant was paying a salary and bonus upon that belief; (4) that plaintiff remained silent about his claim for commissions; and that, if the jury so found, its verdict must be for the defendant. Obviously, the jury did not find these issues for the defendant and our problem, as already indicated, is whether or not there was any such submissible issue.

No cases on like or similar facts are cited by either party. It is defendant's position that plaintiff was guilty of an "estoppel by misrepresentation" or is chargeable with "quasi estoppel." As stated, in Emery v. Brown Shoe Co., Mo., 287 S.W.2d 761, at loc. cit. 766–767: " 'To constitute estoppel in pais, three things must occur: First, an admission, statement, or act inconsistent with the claim afterwards asserted and sued on; second, action by the other party on the faith of such admission, statement, or act; and, third, injury to such other party, resulting from allowing the first party to contradict or repudiate such admission, statement, or act.' State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 53 S.W.2d 394, 399 (9–11), 89 A.L.R. 607; Brown v. Brown, 347 Mo. 45, 146 S.W.2d 553, 554; Prouse v. Schmidt, Mo.Sup., 156 S.W.2d 919, 921; Waugh v. Williams, 342 Mo. 903, 119 S.W.2d 223, 226." As further stated in the same opinion, estoppel is a condition in which " ' "* * * justice forbids that one speak the truth in his own behalf." ' " Again, the doctrine has been somewhat more fully defined in the case of Mills v. Taylor, Mo., 270 S.W.2d 724 at loc. cit. 729, where the court said: " ' " 'To constitute * * * an estoppel, the following elements are essential: "(1) There must be conduct, acts, language, or silence amounting to a representation or a concealment of material facts. (2) These facts must be known to the party estopped at the time of his said conduct, or, at least, the circumstances must be such that knowledge of them is necessarily imputed to him. (3) The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time when such conduct was done, and at the time when it was acted upon by him. (4) The conduct must be done with the intention, or, at least, with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. (5) The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. (6) He must in fact act upon it in

such a manner as to change his position for the worse."'"'"

There is no doubt here that plaintiff accepted compensation on the altered basis from December 1, 1957, to the time his employment terminated. His acts in doing so, at least after he had knowledge or the means of knowledge of the change, may be considered as representations. The first vital question which arises is that of his *knowledge* that he was being paid an increased salary and a bonus *in lieu of* the 3% commissions; the next is defendant's understanding that the commissions had been eliminated, and its reliance thereon; the third question is that of defendant's injury by reliance upon plaintiff's acceptance of the compensation. In all these we consider whether any fact question remained for the jury.

We accept plaintiff's explanation that in *1959* the amount of his check was so close to a 3% commission that he did not realize that it was not being paid as a commission. (When we mention the year, we refer to the end of that fiscal year.) In *1960* his check was $750, whereas his commission would have been $1,982.19. As to that, he testified specifically that he did not want to *"rock the boat"* at that time, as a merger was pending and he thought he was being considered for a "top job," and that he refrained from making any demand. Nothing could show more definitely that he then realized that he was *not* receiving the 3% commissions; he had available all the sales records of his department and knew precisely what a 3% commission would have been. The knowledge which plaintiff thus acquired was sufficient also to charge him then with retroactive notice of the actual situation as of the end of 1959, i. e., that the check for that year was actually a bonus and not commissions. The necessary construction of plaintiff's testimony is that he determined in 1960 to accept the bonus and pass up his claim for commissions, assuming the truth of his statement that he thought in December, 1957, that commissions had not been eliminated. No complaint was made during the next fiscal year, 1961. When the figures were compiled, presumably by the end of the calendar year, he was paid a bonus of $1,500, whereas the commissions would have been $9,809.11. He accepted that check, but it seems clear that then, for the first time, he really became exercised, considered leaving the company, and finally (at some time before March, 1962) talked to Mr. Seidlitz and made a complaint. We thus see that plaintiff, with actual knowledge of the fact that he was not being paid commissions, accepted the changed compensation for a period of at least a year and two or three months, and that he was chargeable with that knowledge for an additional year. We recognize that plaintiff testified at one place that the first time he realized that he was not being paid commissions was at the end of 1961, but that rather casual statement cannot be accepted as counteracting or destroying his specific explanation of his reasons, actions and knowledge in connection with the 1960 bonus. The payment of these bonuses was shown by documentary proof (defendant's Exhibits 13 and 17), and it is conceded in plaintiff's brief.

Counsel question the testimony of defendant concerning its understanding that the 3% commissions had been eliminated, and its reliance thereon. The *necessary* inference from the testimony of Mr. G. R. Seidlitz was that a bonus was substituted for the commissions, by agreement, in his December, 1957, conversation with plaintiff. But we do not rely upon that testimony, since it was oral; the treasurer was immediately notified and all further checks to plaintiff for a period of more than four years were issued on the *altered* basis, and without any objection until the very end of the period. In Swihart v. Missouri Farmers Mutual Tornado, etc., Co., 234 Mo.App. 998, 138 S.W.2d 9, in discussing a question of waiver (and equally applicable to estoppel), the court said, loc. cit. 17: "'* * * A waiver may even take place in consequence of laches merely or in consequence of acting inconsistently with the idea of insisting up-

on the right which is waived, and may be shown by conduct as well as by express words. [Citing cases]. Waiver is often closely related to estoppel, but evidence that fails to show estoppel may show waiver. [Citing cases]. Waiver is ordinarily a question of fact, and depends largely upon the intention of the party. That intention, however, is not the secret intention of the party, but is the intention which is manifested by his conduct or his words in relation to the matter involved. [Citing cases].'" And see, for an approval of that holding, Pasley v. Marshall, Mo.App., 305 S.W.2d 879, 883, which, incidentally, involved a waiver by a guardian of his claim to commissions. The actions of defendant here in making new and different payments over a period of more than four years speak more loudly of its understanding than any oral testimony could do. No doubt could remain that defendant did understand that the right to commissions had been eliminated and further, that it relied upon its belief of that fact.

Next we consider whether defendant suffered any detriment or injury on account of plaintiff's conduct. This will require little discussion. It did pay him a specific salary increase of $3,000 per year for a period of more than four years, in lieu of a loosely stated and ambiguous "expense allowance" of $3,000, against which the record shows withdrawals were made of $448.24, $921.05, $2,588.93, $3,000 and $1,250. Following the salary increase, plaintiff still received reimbursement for all actual expenses. In addition, defendant admittedly paid to plaintiff bonuses of $750, $750, and $1,500, all of which he accepted and disposed of, which he has not tendered back, and for which he has offered no credit, even in this suit. It seems entirely clear that if plaintiff is now allowed to enforce his judgment for the full commissions, $17,662.22, in addition to what he had been paid, defendant will have suffered a rather substantial detriment.

Plaintiff insists here that there were jury issues on the question of estoppel, that the jury's verdict was against defendant, and that it is conclusively bound. Estoppel was submitted, and the jury did find for plaintiff. We do not pass upon the manner of the submission, for no question of specific error is here. It is true that in such a situation the court looks to the evidence favorable to plaintiff and disregards defendant's evidence, except such as may be favorable to plaintiff and not in conflict with his fundamental theory of recovery. Fenneren v. Smith, Mo., 316 S.W.2d 602; Peterson v. Tiona, Mo., 292 S.W.2d 581. So considered, plaintiff says that the terms of the 1957 agreement depended upon oral testimony and involved the credibility of defendant's evidence; also, that estoppel is an affirmative defense, and that the burden of "persuasion" was on defendant. Answering the last suggestion first, we are not concerned with the burden of "persuasion," but only as to whether on all the evidence to which plaintiff is entitled, the issue was one of law or fact. It has frequently been held that a verdict may not be directed in favor of one who has the burden of proof where his evidence is oral, for the jury is entitled to disbelieve that evidence. M.F.A. Co-Op Ass'n of Mansfield v. Murray, Mo.App., 365 S.W.2d 279; State ex rel. and to Use of Hickory County v. Davis, Mo., 302 S.W.2d 892; Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558; Robbins v. Robbins, Mo., 328 S.W.2d 552. Thus, we may not consider defendant's oral testimony here in support of its judgment, though it be uncontradicted; and we give full credence to plaintiff's version of the December, 1957, conversation, namely, that there was no agreement to substitute a bonus for the commissions. Plaintiff specifically argues that the issue of estoppel depended upon oral testimony in that "* * * the terms of that 1957 oral agreement depended on oral evidence, and whether plaintiff was or was not estopped by his acts or omissions depended on the oral evidence as to that oral agreement and on the oral evidence of the understanding the parties had of that oral agreement." We have already stated that we give plaintiff the full benefit of his

oral evidence concerning the agreement and his original understanding. We hold that the acts of defendant over a period of more than four years, as distinguished from any oral testimony, demonstrate its understanding of the agreement as a matter of law. The question of estoppel, from plaintiff's standpoint, depends not upon what he thought the agreement was, but upon what he did and the effect of what he did, and on that the record speaks from documents and from his admissions. He most certainly knew, or as a matter of law should have known, that he was being paid on a different "basis" at least as early as the end of 1960.

There are recognized exceptions to the rule forbidding the direction of a verdict for defendant where its affirmative defense rests upon oral testimony. In Coleman v. Jackson County, 349 Mo. 255, 160 S.W.2d 691, at loc. cit. 693, the court said: "There is, however, a well-recognized exception to the rule. If the opponent, that is the party not having the burden of proof, admits either in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him, and if the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction." This statement was quoted with approval in the recent case of Charles F. Curry Co. v. Hedrick, Mo., 378 S.W.2d 522, at loc. cit. 531. Plaintiff has admitted that, at least as early as the end of 1960, he knew the basis of his compensation had been changed. The facts establishing the other elements essential to estoppel were conceded except defendant's understanding of the change and its reliance upon it; we hold that these

elements were established inalterably by the payments it made for more than four years. We further hold that those payments established an injury to the defendant. We do not rely upon the theory that there was *uncontradicted* testimony or "no real dispute." Rogers v. Thompson, 364 Mo. 605, 265 S.W.2d 282, 287.

■ The application of the principle of estoppel is said to be "more a question of law" than of fact. Fernandez v. Mutual Life Ins. Co. of Baltimore, 230 Mo.App. 857, 78 S.W.2d 526. Certainly this is true when the essential issues are admitted or shown by documentary evidence. We conclude that from the established facts only one reasonable inference can be drawn, namely, estoppel. Compare M & M Securities Co. v. General Motors Acceptance Corp., 230 Mo.App. 900, 79 S.W.2d 521, 531.

The situation here is very similar to that in those cases where a party seeks to accept the benefits of a contract, but to reject all or part of its burdens. It has frequently been held that one may not do so. St. Louis Public Service Co. v. City of St. Louis, Mo., 302 S.W.2d 875; City of St. Louis v. Davidson, 102 Mo. 149, 14 S.W. 825, 22 Am.St. Rep. 764; Magenheim v. Board of Education of School District of Riverview Gardens, Mo., 347 S.W.2d 409; Halloway v. Mountain Grove Creamery Co., 286 Mo. 489, 228 S.W. 451; 31 C.J.S. Estoppel § 108. Indeed, the doctrine of estoppel is often applied in cases of that type, St. Louis Public Service Company case, supra; and this theory of preclusion of recovery "* * * is frequently called an estoppel." id.

The motion of defendants for a directed verdict at the close of all the evidence specifically raised the issue of estoppel. We conclude that the trial court properly entered a judgment for defendants upon that ground.

The judgment is affirmed.

All of the Judges concur.