CHEMICAL FIREPROOFING CORPORA-TION, an Ohio Corporation, d/b/a Acme Cleaning Service Division, Plaintiff-Respondent,

v.

Herbert B. BRONSKA et al., Defendants-Appellants.

No. 37184.

Missouri Court of Appeals, St. Louis District, Division One.

Aug. 24, 1976.

Motion for Rehearing and for Transfer to Supreme Court Denied Sept. 30, 1976.

---

Friedman & Fredericks, Melvin Friedman, Stuart J. Radloff, Clayton, for defendants-appellants.

Cook, Murphy, Lance & Mayer, D. Jeff Lance, Daniel J. Murphy, St. Louis, for plaintiff-respondent.

McMILLIAN, Judge.

Appellant Herbert B. Bronska (Bronska) appeals from a decree enjoining him for a period of one (1) year up to June 29, 1975, from engaging in a business similar to that of respondent, to-wit: the business of a cleaning contractor performing industrial, commercial, or residential cleaning of air-

conditioning equipment and ducts, etc., in the states of Missouri and Illinois; and for two (2) years from soliciting, selling, or contracting to furnish services to any of respondent's customers. Appellant Nancy M. Bronska, wife of Herbert B. Bronska, and Engineered Cleaning Services, Inc., a corporation (ECS), appeal from that portion of the decree enjoining them from conspiring with Herbert B. Bronska to violate the above decree or in any way interfering with the contractual rights of respondent.

Appellants seek a reversal for the following reasons: (1) that the restrictive employment contract had been terminated in April, 1972; (2) that respondent had breached the contract; (3) that the decree failed to delineate with specificity what could and could not be done; and (4) that Nancy Bronska should not have been included in the decree. We affirm.

Respondent, Chemical Fireproofing, is an Ohio corporation (CFC) engaged in business as a cleaning contractor oriented to fire protection. It specializes in industrial, commercial, and some residential cleaning of air-conditioning equipment and ducts, kitchen exhausts, tanks, overhead structures, etc.

CFC hired Bronska to open the St. Louis office. He commenced work for CFC on February 1, 1963. Also on February 1, 1963, CFC and Bronska executed the restrictive employment contract now in question. In 1966 both parties executed another contract backdated to February 1, 1963. The 1966 contract differed from the 1963 contract only to the extent that the area was limited to territory in the states of Missouri and Illinois, and the commission was reduced to twenty (20) percent of sales or services.

The contract provided Bronska with a right to draw against his account to the extent of $150 weekly. Both parties were granted the right to terminate the contract at the end of any week upon giving notice to the other party—that after termination of the agreement, Bronska was not to engage in a business similar to CFC's in Missouri or Illinois for a period of one year and for a period of two years Bronska was not

to deal with customers of CFC's in Missouri and Illinois. Commission on sales and services was to be at the rate of twenty (20) percent and that in the event compensation under the contract was changed by mutual consent all the other terms of the contract were to remain in full force and effect.

In August 1971 a meeting was held in the Ohio office between CFC's president, vice-president, Bronska and the director of the Cincinnati branch office, who was Bronska's father-in-law. The meeting disclosed that for three or four years, the St. Louis office was losing money because of its high operating and selling costs. At this meeting, Bronska was told to hold down expenses to fifty (50) percent or less of total revenue; that if the expenses were fifty percent or less, he would receive a base commission rate of twenty percent; and that if expenses were in excess of fifty percent, the base rate for commissions would be reduced to fifteen percent.

Bronska testified that he told them to close the office if it was losing money and that he would not work for a fifteen percent commission. The meeting closed on the note that for the balance of 1971 things would remain as they were, but at the end of the year the situation would be re-evaluated. After the conference, Bronska returned to St. Louis and continued to work for CFC.

In February, 1972, when Bronska received his January, 1972, commission, based on the fifteen percent rate, he wrote the president protesting that he (Bronska) had not agreed to the five percent reduction and that he expected to receive the rest of his commission. The president responded that CFC would continue to use the fifty percent formula which was discussed with Bronska on two prior meetings in St. Louis and that the proposed fifty percent formula was known to everyone since the August, 1971, meeting. After the receipt of the letter, Bronska continued to work, and in March, 1972, he was paid his commission at the fifteen percent base rate.

On April 1, 1972, Bronska wrote a letter to CFC stating that he had not agreed to a

reduction in commission and he had not received the amount due him under his contract; that he deemed CFC to have breached the contract; that he (Bronska) was no longer bound by any of the contract provisions; that he intended to hold them liable for the full amount of his commission due; and ". . . *I will remain available if satisfactory arrangements are made until no later than April 28, 1972,* to give you an opportunity to make whatever arrangements you may want with reference to the operations of the office." (Emphasis added.)

On April 7, 1972, CFC's president telephoned Bronska and told him he would meet him the last week of April in St. Louis and work something out. In confirmation of the president's telephone call, Bronska wrote back, *"I shall remain active in the operation of the office until April 28, 1972 . . . and I shall continue on the same arrangement as set forth in my employment contract dated February 1, 1963 regarding any commissions relative to sales and services performed during the month of April, 1972."* (Emphasis added.)

At the end of the monthly meeting held in April, the fifty percent formula was discussed, and the president agreed to pay Bronska money from the president's personal fund to ease the transaction, i.e., the five percent difference in commissions. From January, 1972, until June 29, 1974, the date of Bronska's departure from the company, the fifty percent formula was used. In some months Bronska met the goal and received twenty percent commission, and in other months he did not and received a fifteen percent commission. As agreed, in order to ease the transaction, the president gave his personal checks for $850 and $450 to Bronska.

In June, 1974, CFC proposed a new contract to Bronska, but negotiations broke down and Bronska left the company.

Before leaving CFC, Bronska began to solicit some of CFC's customers. On July 8, 1974, ECS was formed. Half of the stock was issued to Bronska, the other half to Nancy, his wife. On July 12, 1974, Bronska transferred all his shares to Nancy as a gift. Bronska is the president and treasurer of ECS, and Nancy, the vice-president and secretary.

ECS is engaged in the same business as CFC. In fact, Bronska took CFC's contract forms, work order forms, and request for estimate forms, and copied or modified them slightly and used them in competition with CFC. In some instances Bronska used the actual form of CFC and simply scratched out CFC's name by hand and substituted ECS's name. The evidence is conclusive that ECS engages in the same business as CFC, and that Bronska solicits and makes contracts in Missouri with CFC's customers.

■ The core issues for decision are: (1) when did Bronska terminate his employment with CFC; and (2) did CFC breach the employment contract by unilaterally changing the mode of compensation. In *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), the Supreme Court set out the parameters of our appellate review under Rule 73.01(a). The court stated that the judgment or decree ". . . will be sustained . . . [1] unless there is no substantial evidence to support it, [2] unless it is against the weight of the evidence, [3] unless it erroneously declares the law, or [4] unless it erroneously applies the law . . . ." In regard to reversal for being against the weight of the evidence, we were cautioned to do so only when there was a firm belief that the decree or judgment was wrong. Undisturbed was section (b) of Rule 73.01, which permits us to give due deference to the opportunity of the trial court to resolve questions of credibility of witnesses.

Applying the above standards to the evidence presented in this case, we are impelled to conclude that the decision entered by the trial court was correct.

Bronska offers to support his position by his letter of April 1, 1972, which he contends abrogated and terminated his employment under the February, 1963, contract, as amended in 1966. To refute Bronska's contention, respondent offers what transpired

at the August, 1971, meeting; its telephone call on April 7, 1972; Bronska's letter in response thereto; the April 26 and 27, 1972, meeting; and Bronska's course of conduct from April 1, 1972, to June 29, 1974.

Bronska cites, for support of his April 1, 1972, termination, the case of *Baker v. Missouri Nat. Life Ins. Co.,* 372 S.W.2d 147, 152–53 (Mo.App. 1963). In *Baker,* at page 152, the court stated, ". . . To be effective, a notice of termination must be clear, definite, unambiguous and unequivocal, and it properly may not be so characterized 'unless its meaning can be apprehended without explanation or argument . . . .'" Granted, when Bronska's letter stated unequivocally that (1) he deemed CFC to have breached the contract, he was no longer bound by it, and he was surrendering to them their property, he met the *Baker* test. But when he stated in the last sentence of his letter, *"I will remain available if satisfactory arrangements are made until no later than April 28, 1972,"* he destroyed the clarity and definiteness posited by the *Baker* test, leaving the letter ambiguous and equivocal as to the date he intended to end his employment. To reinforce our doubts, we note that even Bronska was not too sure because at the hearing on the temporary injunction he himself testified that he resigned on April 28, 1972. But at the trial on the merits, he fixed the date of his resignation at April 1, 1972. Bronska's letter in response to CFC's telephone calls to him on April 7, 1972, informing him that something would be worked out sheds some light on his termination date. In his letter Bronska wrote, "I shall remain active in the operation of the office until April 28, 1972 . . . and I shall continue on the same arrangements . . . in . . . contract dated February 1, 1963." Surely if he had terminated his employment and ceased working for CFC on April 1, 1972, he would not have used the above language. Company orders, sale documents and payroll records indicate that Bronska worked full time beyond April 1, 1972.

In our view, giving due deference to the trial court to judge the credibility of the witnesses, we hold that the trial court's finding that the employment contract was not terminated on April 1, 1972, was supported by substantial evidence and was not against the weight of the evidence. Consequently, we rule this point against appellant Bronska. While it is true that Bronska on April 1, 1972, expressed an intention to terminate his contract, the court's finding that the parties had resolved their differences and Bronska agreed to remain at work, was correct.

■ Next we consider appellant's contention that CFC unilaterally had breached its contract. We note that this issue was largely an issue of fact. And, on conflicting testimony the court resolved this issue against Bronska. Moreover, and of equal importance, Bronska's subsequent conduct does not indicate an intention that either the contract or his employment be terminated. From the testimony the court could have reasonably found that at the August, 1971, meeting when CFC proposed the fifty percent formula, that Bronska protested. But in resolving the conflicting evidence on this issue, the court could have reasonably found, after the vice-president agreed not to implement the fifty percent formula until the end of 1971 at which time the situation would be re-evaluated, that Bronska agreed to the fifty percent formula. Both the president and vice-president testified to this agreement, and even Bronska's father-in-law testified that Bronska did not refuse to accept the fifty percent formula, because according to the father-in-law, Bronska was put in the position of either accepting or ending up without a job.

In January, February, and March, 1972, when Bronska was paid on the fifteen percent base, true he protested and declared an intention to remain at work until April 28, 1972—yet Bronska worked throughout April, drew his checks and considered all favorable incidents of his employment as remaining unchanged. Even if we were to assume for purposes of argument that CFC breached its agreement, Bronska's conduct after knowing of the breach would have effectively waived CFC's assumed breach.

■ Bronska could not repudiate the contract insofar as its terms were unfavorable to him and at the same time claim its benefits. Bronska's testimony shows that he did not consider his duties, his territory, his status as district manager, his paper work, or his rights to a pension and profit sharing, had changed. In our opinion, Bronska cannot be permitted to chew up the sweet and spit out the bitter. As pointed out in *Henges Co., Inc. v. May,* 223 S.W.2d 110, 113 (Mo.App.1949), there is no such thing as a partial recission in the sense that one may repudiate a contract insofar as its terms are unfavorable to him, and at the same time claim its benefits as regards the favorable provisions. Consequently, even if CFC had breached its part of the agreement, we find that Bronska's conduct in continuing to work during the month of April, 1972, continuing to receive his salary and drawing account, and settling his dispute with CFC waived any alleged breach of contract. Therefore, we rule this point against appellants.

■ It is true, as declared in *Commission Row Club v. Lambert,* 161 S.W.2d 732, 736 (Mo.App. 1944), that an injunction must clearly and specifically describe the acts and things enjoined, not just generally so as to be subject to misunderstanding and confusion by those against whom it is directed, but clearly and specifically so that both the complainant and the defendants may know their rights. Here the injunction is almost a direct quote from the 1963 contract, amended in 1966, as agreed to by Bronska. The decree states that Bronska is enjoined until June 29, 1976, in the states of Missouri and Illinois from ". . . soliciting, selling, or contracting to furnish services and products . . . to any person, firm, or corporation which has been a customer of Chemical Fireproofing Corporation or to any person, firm, or corporation to whom Chemical Fireproofing Corporation has submitted a proposal or contract to sell or furnish services or products prior to June 29, 1974."

Appellants argue that the word "customer" is not defined, not that the *types of acts* are subject to confusion. None of the cases cited by appellant in support of this contention are apposite. Each case deals with acts or things enjoined. *Commission Row Club v. Lambert,* supra (" 'unlawfully entering or trespassing in or upon the premises . . unlawfully carrying away personal property . . . [and] unlawfully threatening to arrest members.' ") and *Magel v. Gruetli Benevolent Society,* 203 Mo.App. 335, 218 S.W. 704 (1920) (". . . enjoined and restrained from using the [public] baths in such manner as to cause plaintiffs annoyance and disturbance . . ."). Granted the injunction neither names the customers referred to nor refers to them by reference to Exhibit No. N; yet, in our opinion, the appellants, the court, and the respondent each knows the identity of the customers referred to—because Exhibit No. N, which is Bronska's personal earning statement record, lists every customer of the St. Louis office from the time he opened the St. Louis office in 1963 until one month prior to his leaving the office on June 29, 1974. Consequently, we hold that the injunction is neither imprecise, vague nor unspecific.

■■ Appellant's contention that the restrictive agreement is unenforceable because of unreasonableness is without merit. Reasonableness is determined by the limitation of both time and area contained in the agreement. The test is whether the area in which the restriction is to be enforced is larger than reasonably necessary for the protection of the covenantee. *Renwood Food Products v. Schaefer,* 240 Mo.App. 939, 223 S.W.2d 144, 152 (1949) cited with approval in *Reed, Roberts Assoc. Inc. v. Bailenson,* 537 S.W.2d 238 (Mo.App.1976). Likewise a restrictive employment agreement to be valid must also be reasonable to the employee and the public. *Prentice v. Williams,* 324 S.W.2d 466, 469 (Mo.App. 1959).

■ Here we find that Bronska opened the St. Louis office, and as such was CFC's personification in the St. Louis area. Thus, it is not unfair to assume that all of the goodwill built up in this area was developed

by Bronska. No fair-minded person could reasonably argue that CFC does not have a legitimate interest in protecting its customers from Bronska. In *Mills v. Murray,* 472 S.W.2d 6, 11 (Mo.App.1971), we recognized that an employer had a proprietary right in his stock of customers and their goodwill and that the courts will protect this asset against appropriation by an employee by enforcement of a reasonable restrictive covenant not to compete. See also *House of Tools and Engineering, Inc. v. Price,* 504 S.W.2d 157 (Mo.App.1973). Consequently, considering the subject matter of the contract, the extent of the restraint (one year from engaging in a business similar to that of CFC in Missouri or Illinois, and two years from soliciting, selling, or contracting to furnish services or products to any person or firms which had been customers of CFC in Missouri or Illinois) and the specialization of the business, we cannot say that the restrictions as to time or area are unreasonable. Thus we rule this contention against appellant.

Finally, appellants' argument that Nancy Bronska should not have been enjoined is devoid of merit. In the court's findings of fact, it found that Nancy was the sole stockholder of ECS and vice-president and secretary; that she performed paper work for the company; and carried on telephone communication with its customers. Under these circumstances, it is reasonable to enjoin a stranger to a covenant from aiding or assisting the covenantor in violating his contract or receiving any benefits therefrom. *Mills v. Murray,* supra.[1] Here, Nancy Bronska not only was the covenantor's wife but also the sole shareholder and was actively performing services for ECS that aided her husband in violating his employment contract. Thus we find no impropriety in enjoining her activities.

Accordingly, judgment is affirmed.

WEIER, P. J., and RENDLEN, J., concur.

---

1. "It is accordingly the common practice to make the injunction run to classes of persons through whom the enjoined party may act, such as agents, servants, employees, aiders, abettors, etc. . . ." 42 Am.Jur.2d Injunctions, § 320 at p. 1121. See also *Chase Nat. Bank v. Norwalk,* 291 U.S. 431, 54 S.Ct. 475, 78 L.Ed. 894 (1934).