Stephen COMENS, Appellant,

v.

SSM ST. CHARLES CLINIC MEDICAL GROUP, INC., Respondent.

No. ED 89658.

Missouri Court of Appeals, Eastern District, Division Three.

June 30, 2008.

Jerome J. Dobson, Gregory A. Rich, St. Louis, MO, for Appellant.

Kathi L. Chestnut, Saint Louis, MO, for Respondent.

## *OPINION*

GLENN A. NORTON, Judge.

Stephen Comens appeals from the grant of summary judgment in favor of SSM St. Charles Clinic Medical Group, Inc. ("St. Charles Clinic") on his breach of employment agreement claim. We reverse and remand.

## I. BACKGROUND

Comens, a non-invasive cardiologist, entered into an employment agreement ("Employment Agreement") with St. Charles Clinic[1] on July 19, 1994. The Employment Agreement was for one year and automatically renewed for successive periods of one year unless Comens or St. Charles Clinic provided written notice of non-renewal or written notice of termination to the other party.

The Employment Agreement included two provisions that addressed aspects of Comens's earnings. Section 2(a) provided that St. Charles Clinic would compensate Comens "based on the compensation formula established by the St. Charles Clinic Compensation Committee appointed by the CLINIC Board of Directors and approved by a majority of the CLINIC Board of Directors." Section 5(d) of the Employment Agreement pertained to the part of Comens's medical practice where he earned revenues for performing test interpretations and graphic interpretations pursuant to contracts he had with certain hospitals. That section provided that Comens would directly receive all revenues from those contracts.

On October 18, 1999, John Avants, Executive Director of St. Charles Clinic, wrote a memorandum to Comens, which officially notified Comens of the specifics of a new compensation formula that became effective after October 1, 1999. The memorandum stated in pertinent part that: "[a]ttached is a summary of the new compensation plan which was developed by the Compensation Committee, and approved by the SCCMG Board."[2] The at-

---

**1.** Comens entered into the Employment Agreement with St. Charles Clinic, Inc. St. Charles Clinic, Inc. later changed its name to SSM St. Charles Clinic Medical Group, Inc., which is Respondent's current name.

**2.** Comens asserts in his brief that he learned through discovery that the new compensation plan was not developed by the Compensation Committee and was not approved by the Board of Directors. The factual issue of

tached summary provided that non-invasive cardiologists, including Comens, would owe St. Charles Clinic an annual flat overhead rate in the amount of $50,000 for "Indirect Costs" or "Indirect Expenses."

From October 1999, until the end of his employment on April 30, 2006, Comens accepted the compensation he received from St. Charles Clinic and accepted all of the other benefits of his employment. Additionally, Comens never provided written notice of non-renewal or written notice of termination to St. Charles Clinic. Nevertheless, Comens was concerned with the new compensation formula. Specifically, Comens believed that St. Charles Clinic imposed the annual flat overhead rate of $50,000 to charge him for revenues that he generated from performing graphic interpretations pursuant to contracts he had with certain hospitals, even though the Employment Agreement stated that he would directly receive those revenues.

Comens voiced his complaints about the new compensation formula by writing letters to St. Charles Clinic in November 1999, February 2000, June 2000, November 2002, June 2003, and October 2004. Comens wrote these letters in conjunction with fellow cardiologists in his group, through his attorney, and on his own behalf.

First, on November 29, 1999, Comens and other cardiologists in his group sent a letter to Dr. Thomas A. Schneider, a member of St. Charles Clinic's Compensation Committee and Board of Directors. Comens and the cardiologists stated in the letter that the new compensation formula considered revenues the cardiologists earned by performing graphics interpretations and that "a marked adjustment in the compensation formula will be required with a lowering of the overhead for the cardiology group."

Then, Comens's attorney wrote a letter to St. Charles Clinic's Compensation Committee on February 24, 2000. In this letter, Comens's attorney stated that the new compensation formula's annual flat overhead rate of $50,000 "is probably a breach" of paragraph 5(d) of the Employment Agreement, which "specifically allows Dr. Comens to directly receive certain payments for consultations from hospitals . . . ."

Comens and other cardiologists in his group sent another letter to St. Charles Clinic's Board of Directors on June 13, 2000. The cardiologists stated in the letter that they "continue to have some concerns about the recently established compensation formula for our cardiology department." Acknowledging that "some concessions from the cardiology department are necessary, to assist with the increasing overhead encountered by other physicians in the clinic," the doctors proposed the following changes in the compensation formula:

(1) Effective July 1, 2000, the fixed indirect fees imposed upon the cardiologists by the current compensation formula will be eliminated.

(2) In place of the indirect fees, it will be agreed that, effective July 1, 2000, the Clinic should receive 25% of the professional fees earned by the cardiologists for work done in the St. Charles Clinic cardiology lab. . . .

(3) Revenues paid to the cardiologists by the hospitals for graphics interpretations should continue to go directly to the cardiologists. The Clinic should make no efforts to monitor those revenues, or

---

whether the new compensation plan was actually developed by the Compensation Committee and approved by the Board is not relevant to the disposition of this appeal; however, it may be relevant on remand.

to use them to guide future compensation formulas, as specified by our current contracts.

Next, on November 14, 2002, Comens wrote a letter to St. Charles Clinic's Compensation Committee, requesting that the committee reconsider the new compensation formula's annual flat overhead rate of $50,000. Comens noted in the letter that the overhead rate "was based, in large part, upon the income derived from interpreting graphics at the hospitals that did not pass through the clinic, but was paid to the cardiologists directly."

The record reveals that St. Charles Clinic's first and only written response to Comens's letters was on June 13, 2003, when the chairman of the Compensation Committee wrote a letter to Comens. The chairman stated in the letter that the Compensation Committee reviewed the flat overhead rate of $50,000 pursuant to Comens's request and acknowledged that it "might need to be revised." The chairman further stated that the Compensation Committee suggested that Comens and Dr. Taber, another cardiologist who was also being charged a flat overhead rate, consider the following three options: (1) "subject all graphics income to the usual overhead process under the compensation plan;" (2) "negotiation between Dr. Taber and Dr. Comens as to an acceptable adjustment in the fixed indirect expense distribution;" or (3) "[i]f an agreement cannot be reached, then the Compensation Committee would be willing to consider formulating its own recommendation, subject to approval by the Board. . . ."

On June 27, 2003, Comens replied by letter to the chairman of the Compensation Committee. Comens advised the chairman that he and Dr. Taber had been unable to agree to changes in the current overhead arrangement, and requested that the Compensation Committee adjust the annual flat overhead rate.

Comens expressed his concerns with the new compensation formula for a sixth time in a letter he and another cardiologist wrote to the chairman of St. Charles Clinic's Board of Directors on October 15, 2004. In this letter, Comens stated that the distribution of the flat overhead rate, "$50,000 against Dr. Comens and $10,000 against Dr. Taber, was justified initially by the fact that Dr. Comens read significantly more graphics at the hospitals than did Dr. Taber. This situation has since changed." Comens also advised the chairman that as of January 1, 2005, each member of his three-man cardiology group would be responsible for an equal amount of graphics interpretations from hospitals, and asked that the distribution of the flat overhead rate reflect the change in the cardiologists' responsibilities.

Comens filed this action against St. Charles Clinic in September 2005, alleging that it breached the terms of the Employment Agreement in October 1999, when it implemented the new compensation formula which imposed the annual flat overhead rate of $50,000. Comens asserted that because St. Charles Clinic imposed this annual flat overhead rate to charge him for revenues that he generated from performing graphic interpretations pursuant to contracts he had with certain hospitals, it breached section 5(d) of the Employment Agreement, which stated that Comens would directly receive these revenues. Comens also alleged that he notified St. Charles Clinic of his objection to this fee, and that St. Charles Clinic had not cured its breach. Thereafter, St. Charles Clinic gave Comens written notice that he was terminated effective April 30, 2006, pursuant to the Employment Agreement.

After Comens's termination, St. Charles Clinic filed an answer to Comens's petition

and filed a motion for summary judgment. In both of these pleadings, St. Charles Clinic raised equitable estoppel as an affirmative defense. The trial court granted St. Charles Clinic's motion for summary judgment on the grounds that Comens was estopped from claiming that St. Charles Clinic breached the Employment Agreement because Comens "allowed the Employment Agreement to renew ... while accepting compensation and benefits of that agreement." Thereafter, Comens filed a motion to vacate the trial court's judgment or, in the alternative, to amend and modify the judgment. The trial court did not rule on this motion. Comens appeals.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is reviewed essentially *de novo* and affirmed only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). "The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." *Id.* at 380. St. Charles Clinic, as a defending party, may establish a right to judgment as a matter of law by showing that there is no genuine dispute as to the existence of each of the facts necessary to support a properly-pleaded affirmative defense. *See id.* at 381. If St. Charles Clinic has met this burden, then Comens may avoid summary judgment by responding with specific facts showing the existence of a genuine issue for trial. *See id.* Although we view the record and construe all inferences favorably to Comens, the non-movant, facts set forth in support of St. Charles Clinic's summary judgment motion are taken as

true unless contradicted by Comens's response. *See id.* at 376.

### B. St. Charles Clinic's Affirmative Defense of Equitable Estoppel

Comens presents two points on appeal, the first of which is dispositive. In his first point on appeal, Comens argues that the trial court erred in granting summary judgment in favor of St. Charles Clinic on his breach of Employment Agreement claim because St. Charles Clinic has failed to prove the existence of each of the facts necessary to support its affirmative defense of equitable estoppel. We agree.

### 1. General Principles Regarding the Doctrine of Equitable Estoppel

The doctrine of equitable estoppel, also referred to as "estoppel by conduct" or "estoppel *en pais*," is an affirmative defense. *Ryan v. Ford*, 16 S.W.3d 644, 651 (Mo.App. W.D.2000). Equitable estoppel arises from the unfairness of allowing a party to belatedly assert rights if he knew of those rights but took no steps to enforce them until the other party has, in good faith, been disadvantaged by changed conditions. *Investors Title Co. v. Chicago Title Insurance Co.*, 983 S.W.2d 533, 537 (Mo.App. E.D.1998). Whether the doctrine applies depends upon the facts and circumstances of each particular case. *Peerless Supply Co. v. Industrial Plumbing & Heating Co.*, 460 S.W.2d 651, 666 (Mo.1970). Nevertheless, equitable estoppel is not favored in the law and it will not be invoked lightly. *Investors Title*, 983 S.W.2d at 537.

"[E]quitable estoppel requires more than proof of acceptance of benefits." *Ryan*, 16 S.W.3d at 651. In order for a party to prevail on a theory of equitable estoppel, he must prove every fact essential to create an estoppel by clear and satisfactory evidence. *Investors Title*, 983 S.W.2d at 537. Specifically, "there must

be a representation made by the party estopped and relied upon by another party who changes his position to his detriment." *Id.* In other words, the representation made by the party estopped must be inconsistent with the claim afterwards asserted and sued upon, and another party must have relied upon the representation and been injured thereby. *Ryan*, 16 S.W.3d at 651. The representation may be manifested by affirmative conduct in the form of acts or words, or by silence amounting to concealment of material facts. *Investors Title*, 983 S.W.2d at 537. To amount to concealment, these material facts must be known to the party estopped and unknown to the other party. *Id.*

**2. The Application of the Doctrine of Equitable Estoppel to this Case is a Question of Law**

■ The application of the doctrine of equitable estoppel is "more a question of law" than of fact, especially when, as in this case, the essential factual issues are undisputed and shown by documentary evidence. *See Rodgers v. Seidlitz Paint & Varnish Co.*, 404 S.W.2d 191, 198 (Mo. 1966) (internal quotation omitted). Both St. Charles Clinic and Comens agree that from October 1999, until the end of Comens's employment on April 30, 2006, Comens accepted compensation, benefits, and continued employment. In addition, it is undisputed that Comens voiced complaints about the new compensation formula by writing letters (in conjunction with fellow cardiologists in his group, through his attorney, and on his own behalf) to St. Charles Clinic in November 1999, February 2000, June 2000, November 2002, June 2003, and October 2004. Finally, both parties agree that Comens sued St. Charles Clinic in September 2005.

Importantly, the parties disagree as to the legal effect of these facts. Thus, the issue on appeal is whether Comens's acceptance of compensation, benefits, and continued employment under the Employment Agreement for almost six years before filing suit estopped him as a matter of law from pursuing his breach of Employment Agreement claim against St. Charles Clinic when, contemporaneously with that conduct, Comens repeatedly voiced complaints about the new compensation formula. In order to determine this issue, we must ascertain whether Comens's conduct, including his complaints, was inconsistent with his breach of Employment Agreement claim. *See Investors Title*, 983 S.W.2d at 537 (finding that when the evidence showed that the plaintiff made no acts that were inconsistent with its position that the defendants should comply with the terms of the contract, the trial court did not err in finding that the plaintiff was not estopped from bringing a breach of contract claim).

**3. Comens's Conduct, Including his Complaints, was not Inconsistent with his Breach of Employment Agreement Claim**

St. Charles Clinic argues that Comens is estopped from bringing his breach of Employment Agreement claim because Comens's acceptance of compensation, benefits, and continued employment was inconsistent with his claim, citing *Long v. Huffman*, 557 S.W.2d 911 (Mo.App.1977). Comens claims that his conduct was not inconsistent with his breach of Employment Agreement claim because *Long* is distinguishable from the facts of this case. Comens also maintains that other Missouri cases indicate that a party's complaints, like those made by Comens, are an important factor in determining whether the doctrine of equitable estoppel applies.

**a. Comens's Conduct Analyzed Under *Long***

In *Long*, a physician-employee argued on appeal that his former employer was

not entitled to an injunction enforcing a restrictive covenant, or a covenant not to compete, in the parties' contract because the employer was the first to materially breach the contract. 557 S.W.2d at 913, 915, 916. The employee claimed that the employer materially breached the parties' contract when the employer, *inter alia*, incorporated its medical practice without the employee's consent. *Id.* at 915.

In evaluating whether the employee was estopped from asserting its breach of contract claim, the court of appeals noted that the employee was aware of the employer's incorporation of the medical practice from the first day of the contract term, but "made no objection." *Id.* at 915–16. Because the *Long* court noted this fact in its discussion of whether or not the employee was estopped from asserting his breach of contract claim, we find that the employee's failure to make a complaint was a factor in the court's equitable estoppel analysis. *See id.* The court stated that the employee was bound by the rule that a person who accepts benefits under a contract will not be allowed to affirm a contract in part by accepting its benefits and disaffirm it in part by avoiding some of its obligations because these are inconsistent positions. *Id.* Applying that rule to the facts of that case, the court found that when the employee accepted the benefits of the contract, he must also have accepted the burden of the covenant not to compete to which he also agreed. *Id.* at 916. Under this reasoning, the *Long* court held that the employee was estopped to deny the enforcement of the covenant not to compete on the grounds that the employer was the first party to materially breach the employment contract because the employee accepted compensation, other benefits, and employment under the contract. *Id.* at 915–16.

We find that Comens's conduct is different from the employee's conduct in *Long* for two reasons. First, unlike the employee in *Long*, Comens is not attempting to avoid or repudiate any of his obligations under the Employment Agreement. Rather, Comens only is asserting that *St. Charles Clinic* has repudiated, or breached, its obligations under the Employment Agreement. Accordingly, the inconsistent positions taken by the employee in *Long* are not present in this case. Secondly, and equally as important, the employee in *Long* "made no objection" to the employer's alleged breach even though he was aware of it at the time he first signed the contract. In contrast, Comens voiced complaints about St. Charles Clinic's new compensation formula in November 1999, February 2000, June 2000, November 2002, June 2003, and October 2004 after he learned of the new compensation formula in October 1999. Because Comens's conduct is unlike the employee's conduct in *Long*, *Long* is distinguishable.

### b. Comens's Conduct Analyzed Under Other Missouri Cases

Other Missouri cases indicate that whether or not a plaintiff has made timely and frequent complaints can be an important factor in determining whether the doctrine of equitable estoppel applies. For example, *Rodgers* demonstrates that when a plaintiff failed to make timely complaints about an issue to the defendant, he is estopped from bringing suit over that issue. *See* 404 S.W.2d at 194 (stating that the Missouri Supreme Court was "not so much concerned with [the date of the plaintiff's demand for commissions] as [it was] with ascertaining when the plaintiff first made complaint of the new arrangement for compensation"); *Id.* at 192–96, 198 (finding that the plaintiff was estopped from asserting a claim for unpaid commissions against the defendant when the

plaintiff had actual knowledge of the changed compensation arrangement for at least fourteen to fifteen months before making his first complaint). Additionally, other cases demonstrate that a plaintiff who has made frequent complaints about an issue to the defendant is not estopped from bringing suit over that issue. *See Wippler v. Hohn*, 341 Mo. 780, 110 S.W.2d 409, 409–412 (Mo.1937) (finding that the plaintiffs were not estopped from bringing action to enjoin the operation of a repair garage when they "frequently complained of the operation of the garage"); *Investors Title*, 983 S.W.2d at 536, 537 (finding that there were no acts by the plaintiff inconsistent with its claim that the defendants breached their contract by acquiring another company when the plaintiff "renewed its objection to the acquisition on numerous occasions"); *Luck "E" Strike Corp. v. First State Bank of Purdy*, 75 S.W.3d 828, 834 (Mo.App. S.D.2002) (finding that there was no admission, statement, or act by a bank that was inconsistent with its claim for late fees when the evidence showed that "the issue of late fees was an area of disagreement between the parties").

■ We find that these cases collectively indicate that when a plaintiff has made timely and frequent complaints which notified the defendant that there was a disagreement about a particular issue prior to the plaintiff making a claim about that issue, the plaintiff has not made inconsistent representations. Consistent with our finding is St. Charles Clinic's failure to cite any case involving the doctrine of equitable estoppel where a court has found that a plaintiff is estopped from asserting a claim on an issue with respect to which he has made timely and frequent complaints.[3]

We now turn to whether Comens made timely and frequent complaints which notified St. Charles Clinic that there was a disagreement about the new compensation formula prior to Comens filing a lawsuit against St. Charles Clinic over this issue. As previously noted, it is undisputed that Comens voiced his complaints about the new compensation formula by writing letters to St. Charles Clinic in November 1999, February 2000, June 2000, November 2002, June 2003, and October 2004. Comens wrote these letters in conjunction with fellow cardiologists in his group, through his attorney, and on his own behalf prior to filing suit against St. Charles Clinic in September 2005.

On November 29, 1999, Comens and other cardiologists in his group sent a letter to St. Charles Clinic, which indicated that the new compensation formula considered revenues the cardiologists earned by performing graphics interpretations. We find that the letter timely notified St. Charles

---

3. We note that St. Charles Clinic does cite *Chemical Fireproofing Corp. v. Bronska*, a case involving the doctrine of waiver. 542 S.W.2d 74 (Mo.App.1976). In *Chemical Fireproofing*, the court of appeals found that the employee waived any claim that the employer breached the parties' contract by unilaterally changing the employee's compensation when the employee made complaints in August 1971, January 1972, February 1972, and March 1972 because the employee continued to work, continued to receive his salary, and settled his dispute with his employer. *Id.* at 78–79. We find that *Chemical Fireproofing* is distinguishable for several reasons. First, waiver and estoppel are different legal doctrines. *Brown v. State Farm Mutual Automobile Insurance Co.*, 776 S.W.2d 384, 387 (Mo. banc 1989). Secondly, unlike the employee in *Chemical Fireproofing*, Comens did not settle his dispute with his employer prior to asserting his breach of contract claim. *Chemical Fireproofing*, 542 S.W.2d at 79. Finally, the employee in *Chemical Fireproofing*, like the employee in *Long, supra*, was seeking to avoid a restrictive covenant under the parties' contract, whereas Comens is not attempting to avoid or repudiate any of his obligations under the Employment Agreement. *Id.* at 75–76, 79.

Clinic that there was a disagreement about the new compensation formula because it was written approximately one month after Comens was officially notified of the new compensation formula and because it stated that "a marked adjustment in the compensation formula will be required...."

As discussed below, Comens then wrote five more letters to St. Charles Clinic in February 2000, June 2000, November 2002, June 2003, and October 2004. We find that these letters frequently notified St. Charles Clinic that there continued to be a disagreement about the new compensation formula.

On February 24, 2000, Comens's attorney wrote a letter to St. Charles Clinic that indicated there continued to be a disagreement about the new compensation formula. This letter stated that the new compensation formula's annual flat overhead rate of $50,000 "is probably a breach" of paragraph 5(d) of the Employment Agreement, which "specifically allows Dr. Comens to directly receive certain payments for consultations from hospitals...."

On June 13, 2000, Comens and other cardiologists wrote a letter stating that they "continue to have some concerns about the recently established compensation formula for our cardiology department." In this letter, the doctors proposed in relevant part that: (1) "the fixed indirect fees imposed upon the cardiologists by the current compensation formula ... be eliminated;" and (2) "[r]evenues paid to the cardiologists by the hospitals for graphics interpretations should continue to go directly to the cardiologists. The Clinic should make no efforts to ... use [these revenues] to guide future compensation formulas, as specified by our current contracts...."

Then, on November 14, 2002, Comens wrote a letter to St. Charles Clinic's Compensation Committee, requesting that the committee reconsider the new compensation formula's annual flat overhead rate of $50,000. Comens noted in the letter that the overhead rate "was based, in large part, upon the income derived from interpreting graphics at the hospitals that did not pass through the clinic, but was paid to the cardiologists directly."

After St. Charles Clinic's first and only written response to Comens's letters on June 13, 2003, which acknowledged that the flat overhead rate of $50,000 "might need to be revised," Comens wrote the St. Charles Clinic again on June 27, 2003. In this letter, Comens advised the chairman that Comens and Dr. Taber had been unable to agree to changes in the current overhead arrangement, and requested that the Compensation Committee adjust the annual flat overhead rate.

On October 15, 2004, Comens expressed his concerns with the new compensation formula for a final time before filing suit against St. Charles Clinic. In this letter, Comens and another cardiologist told the chairman of St. Charles Clinic's Board of Directors that the distribution of the flat overhead rate, "$50,000 against Dr. Comens and $10,000 against Dr. Taber, was justified initially by the fact that Dr. Comens read significantly more graphics at the hospitals than did Dr. Taber. This situation has since changed." Comens further advised the chairman that as of January 1, 2005, each member of his three-man cardiology group would be responsible for an equal amount of graphics interpretations from hospitals, and asked that the distribution of the flat overhead rate reflect the change in the cardiologists' responsibilities.

■ In sum, we find that Comens's letters timely and frequently notified St.

Charles Clinic that there was a disagreement about the new compensation formula prior to Comens filing his breach of Employment Agreement claim on that issue. As a result, St. Charles Clinic has failed to prove that Comens's conduct was inconsistent with his breach of Employment Agreement claim.

#### c. Conclusion as to Comens's Conduct

 We hold that Comens's acceptance of compensation, benefits, and continued employment was not inconsistent with his claim that St. Charles Clinic breached the parties' Employment Agreement when it implemented a new compensation formula for two reasons: (1) Comens is not attempting to repudiate any of his obligations under the Employment Agreement; and (2) Comens's several letters timely and frequently notified St. Charles Clinic that there was a disagreement about the new compensation formula prior to Comens filing his breach of Employment Agreement claim on that issue.

Because St. Charles Clinic has failed to prove that Comens's conduct was inconsistent with his breach of Employment Agreement claim, it has failed to prove the existence of each of the facts necessary to support its affirmative defense of equitable estoppel and, therefore, it has not established that it is entitled to judgment as a matter of law. Point one is granted.[4]

### III. CONCLUSION

We reverse the trial court's grant of summary judgment in favor of St. Charles Clinic on Comens's breach of Employment Agreement claim, and we remand to the trial court for proceedings consistent with this opinion.

ROY L. RICHTER, P.J., and CLIFFORD H. AHRENS, J., concur.

---

4. Because this point is dispositive, it is unnecessary for us to address Comens's second point on appeal which maintains that the trial court erred in granting St. Charles Clinic's motion for summary judgment on the basis of equitable estoppel because St. Charles Clinic acted with unclean hands.